**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE *EX PARTE* APPLICATION OF SAUL KLEIN<br><br>*Petitioner,*<br><br>For an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery for use in Foreign Proceedings in the Federative Republic of Brazil. | Case No. 23-Misc.211 |

## MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION
## <u>FOR ORDER PURSUANT TO 28 U.S.C. § 1782</u>

**MB SCANLON PLLC**
Gabriela Menna Barreto Scanlon
4301 50th Street NW, 1st Floor
Washington, D.C., 20016 Telephone:
(202) 410-9293 Email:
gabriela@mbscanlon.com

Attorney for Petitioner Saul Klein

June 28, 2023

## **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** .......................................................................1

I.    FACTUAL BACKGROUND

    A. The Parties ... ....................................................................................4

    B. The Klein Family and *Casa Bahia* .................................................. 6

    C. The *Casa Bahia* Sale and Petitioner's Exit from the Family Business.................................. 7

    D. Petitioner Unravels Serious Misconduct Concerning the Sale of *Casa Bahia* .........10

    E. The Klein Family and Its Foreign Presence ..................................... 12

II.    THE FOREIGN PROCEEDINGS ...............................................................14

    A. The Probate Proceeding. ...................................................................14

    B. The Memorandum of Understanding Entered into Between Samuel's Legitimate Heirs – *Memorando de Entendimentos*.. ................................................16

    C. The Accounting Proceeding ("*Ação de Prestação de Contas*") .. ..........................20

    D. The Preliminary Discovery Proceedings ("*Ações de Produção Antecipada de Provas*") .. ...........................................................................22

    E. The Criminal Investigation.................................................................23

    F. The Contemplated Proceedings........................................................24

    G. Respondents Possess Highly Material Information for Use in the Foreign Proceedings. ......................................................................25

**ARGUMENT**.........................................................................................26

I.    PETITIONER SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782. ..................................................................................27

    A. Respondents are Found in This District ...........................................27

    B. Discovery Sough if "*For Use*" In Foreign Proceedings..........................28

    C. Petitioner is an "*Interested Person*" ...............................................30

i

II.    ALL OF THE DISCRETIONARY FACTORS OF SECTION 1782 WEIGH IN FAVOR

OF PERMITTING THE DISCOVERY PETITIONER SEEKS. ................................30

    A.  The First *Intel* Factor Favors Granting Discovery Because Respondents Are Not

        Parties to the Foreign Proceedings ..........................................................................31

    B.  The Second *Intel* Factor Favors Granting Discovery Because the Brazilian Courts

        and Authorities Will Be Receptive to the Requested Discovery. ............................32

    C.  The Third *Intel* Factor Favors Granting Discovery Because the Application Is Made

        in Good Faith and Does Not Circumvent Any Proof-Gathering Restrictions. ........33

    D.  The Fourth *Intel* Factor Favors Granting Discovery Because the Requests Are

        Narrowly-Tailored and Proportional to The Needs Of The Foreign Proceedings. .34

III.    THIS APPLICATION SHOULD BE GRANTED *EX PARTE* ....................................35

**CONCLUSION** .........................................................................................................................**36**

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*In re Accent Delight Int'l Ltd.*,
  869 F.3d 121 (2d Cir. 2017) ............................................................................... 31

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
  121 F.3d 77 (2d Cir. 1997) ................................................................................. 35

*In re Application of OOO Promnesfstroy*,
  No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) ......................... 33

*Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*,
  No. 17-MC-00216(VEC), 2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017) ............... 29

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012) ............................................................ 28, 29, 30, 32, 35

*In re Edelman*,
  295 F.3d 171 (2d Cir. 2002) ............................................................................... 29

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ........................................................................... 29, 34

*In re Gianoli Aldunate*,
  3 F.3d 54 (2d Cir. 1993) ..................................................................................... 36

*In re Gushlak*,
  No. 11-MC-218 NGG, 2012 WL 1514824 (E.D.N.Y. Apr. 30, 2012) ................... 37

*Hertz Corp. v. Friend*,
  559 U.S. 77, 93 (2010) ....................................................................................... 29

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ..................................................................................... *passim*

*Inv. Vehicles v. KPMG, L.L.P.*,
  798 F.3d 113 (2d Cir. 2015) .................................................................... 31,32, 33

*In re Klein*,
  No. 20-MC-203(PKC), 2022 WL 14786787 (S.D.N.Y. Oct. 26, 2022) ................. 30

*In re Lane*,
  No. 22 MISC. 34(LGS), 2022 WL 16737132 (S.D.N.Y. Nov. 7, 2022) ................. 29, 30

*In re Pimenta*,
  942 F. Supp. 2d 1282 (S.D. Fla. 2013) ................................................................ 30

**<u>Statutory Authorities</u>**

28 U.S.C. § 1782.........................................................................................................................*passim*

## MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION
## FOR ORDER PURSUANT TO 28 U.S.C. § 1782

Petitioner Saul Klein ("Petitioner") respectfully submits this Memorandum of Law in support of his *ex parte* Application and Petition (the "Application") pursuant to 28 U.S.C. § 1782 ("Section 1782"), for an order authorizing him to obtain discovery from the following financial institutions: Citibank, N.A. ("Citibank"); Banco Santander S.A. New York ("Santander"); Santander Investment Securities Inc. of New York ("Santander NY"); JPMorgan Chase Bank, N.A. ("JPMorgan Chase"); J.P. Morgan Securities LLC ("JPMorgan Securities); Credit Suisse (USA), Inc. ("Credit Suisse"); Safra National Bank of New York ("Safra"); Banco Itaú S.A. New York Branch ("Itaú")' Itau CorpBanca ("Itaú CorpBanca"); Itaú Securities ("Itaú Securities"); The Clearing House Payments Company LLC ("CHIPS"); and The Federal Reserve Bank of New York ("Federal Reserve Bank") (together, "Respondents") for use in judicial proceedings pending and contemplated in Brazil.  A Proposed Order is attached hereto as **Exhibit A**.  The proposed form subpoena is attached hereto as **Exhibit B**.[1]

The pertinent facts set forth herein are supported by the declaration of Petitioner's Brazilian civil and criminal attorneys, Katia Vilhena Reina (the "Reina Decl.") and Luiza A. Vasconcellos Oliver (the "Oliver Decl."), and attachments, which are attached hereto as **Exhibits C and D**.

## PRELIMINARY STATEMENT

This application arises from foreign civil and criminal proceedings in Brazil concerning the assets of the late Samuel Klein, a prominent Brazilian businessman and founder of the *Casas Bahia* retail chain.  Samuel Klein passed away on November 20, 2014.  He is survived by his children, Petitioner, and his two siblings, Michael Klein and Eva Lea Klein Ostrovsky.  Samuel

---

[1] Petitioner attached one form of subpoena *duces tecum* and its attachment A.  At the direction of the Court, Petitioner will issue the same form of subpoena and attachment to all twelve (12) Respondents.

Klein's probate proceeding was filed on January 15, 2015 ("the Probate Proceeding"), and Michael was assigned as the administrator of his father's probate proceeding and executor of Samuel Klein's estate, thus allowing him to oversee and have full control over the Kleins family's assets, which are substantial.[2]

Unfortunately, Michael Klein was not been transparent with Petitioner about Samuel Klein's wealth at the time of his death. As the estate's executor, Michael always had full visibility and control of his father's assets. He took advantage of that position in March 2015 to orchestrate a memorandum of understanding among Samuel Kelin's legitimate heirs that supposedly split the entirety of Samuel Klein's assets, including by advancing Petitioner a portion of what Petitioner thought was his inheritance share. Petitioner was deceived when accepting the terms of such document, as Michael Klein failed to report to Petitioner and the probate court the entirety of Samuel Klein's assets, most specifically the substantial offshore assets held by Samuel Klein. Michael Klein therefore deprived Petitioner of his rightful inheritance by failing to report hundreds of millions of dollars in assets owned by Samuel Klein abroad.[3]

After a thorough investigation, Petitioner identified several discrepancies in the assets reported by his brother to the probate court, which omitted multiple U.S. companies and real estate properties. Petitioner also uncovered corporate fraud in the family business that occurred in the months before and after Samuel Klein's death. Additionally, upon Petitioner's information and belief, Michael Klein is currently negotiating the sale of a billion-dollar investment portfolio through a financial institution located in this District, which includes real estate and other

---

[2] *See:* https://alchetron.com/Samuel-Klein-(businessman) (estimating Samuel Klein's 2013 net worth at $835 million).

[3] Petitioner's investigative efforts in the United States show that, from October 2014 (one month before Samuel Klein's death) through March 2015 (when the MOU was signed), Michael purchased approximately **$310 million** in properties in the United States through U.S. incorporated companies.

investments in the United States that, upon Petitioner's recent investigative efforts, belonged to his father.

Petitioner has initiated criminal and civil proceedings in Brazil to (a) account for Michael Klein's misconduct as Samuel Klein's executor (the "Accounting Proceeding"), (b) hold Michael Klein criminally liable for embezzlement for forging Samuel Klein's signatures in corporate transactions documents just before his death, which significantly impacted the estate's assets to the benefit of Michael Klein (the "Criminal Investigation"), and (c) request documents from *Casas Bahia* and Samuel Klein's estate concerning the corporate transactions and foreign assets (the "Document Request Proceedings") (together with the Probate Proceeding, the "Foreign Proceedings").  Petitioner also intends to initiate civil proceedings to annul the memorandum of understanding he signed in March 2015 (the "Contemplated Foreign Proceedings").

Petitioner brings this Application to obtain targeted evidence from Respondents relating to the misappropriated assets for use in the Foreign Proceedings and Contemplated Foreign Proceeding.

This Application meets the statutory requirements of Section 1782.  Respondents "reside or are found" in the Southern District of New York because they are either headquartered in this District or have their principal place of business or main bank branches in this District.  The discovery sought by Petitioner is highly material and relevant to the issues at stake in the Foreign Proceedings and Contemplated Foreign Proceeding.  Moreover, the discretionary factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) all favor authorizing the discovery sought by Petitioner: (i) Respondents are not parties to the foreign proceedings, and Petitioner is otherwise unable to obtain the discovery in Brazil; (ii) the Brazilian courts and authorities will be receptive to discovery Petitioner seeks; (iii) the Application does not circumvent

3

foreign proof gathering restrictions and is made in good faith; and (iv) the discovery sought is neither unduly intrusive nor burdensome.

In addition, granting this Application would also further the "twin aims" of Section 1782: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." Accordingly, Petitioner respectfully requests that the Court grant his Application and permit Petitioner to serve the Proposed Subpoenas on Respondents.

## I.   FACTUAL BACKGROUND

### A.   <u>The Parties</u>

1.   ***Samuel Klein.***   Samuel Klein was the father of Michael Klein, Eva Lea Klein Ostrovsky, and Petitioner.  He founded of *Casas Bahia*, and the assets of his estate are at issue in the Foreign Proceedings and Contemplated Foreign Proceeding.  Samuel Klein passed away on November 30, 2014.

2.   ***Saul Klein.***   Saul Klein, "Petitioner," is the second son of Samuel Klein.  Petitioner is the brother of Michael Klein and Eva Lea Klein Ostrovsky.  Petitioner is a legitimate heir to his father's estate.  Petitioner is the plaintiff/claimant/victim in the Foreign Proceedings and will be the plaintiff in the Contemplated Foreign Proceeding.

3.   ***Michael Klein.***   Michael Klein is the first-born son of Samuel Klein and executor of his father's estate.  Michael Klein has always been primarily in control of Samuel Klein's assets. Michael is the brother of Petitioner and Eva Lea Klein Ostrovsky.

4.   ***Eva Klein.***   Eva Lea Klein Klein Ostrovsky is the daughter of Samuel Klein.  Ms. Klein is also the sister of Michael Klein and of Petitioner. Eva Lea Klein Ostrovsky is a legitimate heir to Samuel Klein's estate.

5.      **Citibank, N.A.** ("Citibank").  Citibank is the primary U.S. banking subsidiary of Citigroup Inc., located in this District at 388 Greenwich St, New York, NY 10013.

6.      **Banco Santander S.A. New York** ("Santander").  Santander is a wholly owned subsidiary of Madrid-based Banco Santander, S.A.  Santander comprises six financial companies: Santander Bank, N.A.; Santander Consumer USA Holdings Inc. (NYSE: SC); Banco Santander International of Miami; Santander Securities LLC of Boston; Santander US Capital Markets LLC of New York; and several other subsidiaries.  Additionally, there is a branch of Santander in New York.[4]  Santander is located in this District at 45 East 53rd street.

7.      **Santander Investment Securities Inc. of New York** ("Santander NY").  Santander NY is part of the Santander US entities and is located in this District at 45 East 53rd Street.[5]

8.      **JPMorgan Chase Bank, N.A.** ("JPMorgan Chase").  JPMorgan Chase is a U.S. financial institution located in this District at 270 Park Avenue, New York, NY.

9.      **J.P. Morgan Securities LLC** ("JPMorgan Securities").  JPMorgan Securities is a U.S. financial institution located in this District at 270 Park Avenue, New York, NY.

10.     **Credit Suisse (USA), Inc.** ("Credit Suisse").  Credit Suisse is a financial institution located in this District at 11 Madison Avenue New York, NY 10010.

11.     **Safra National Bank of New York** ("Safra").  Safra is a nationally chartered U.S. Bank supervised by the Office of the Comptroller of the Currency and is headquartered in this District at 546 Fifth Avenue, New York, NY, 10036.[6]

12.     **Banco Itaú S.A. New York Branch** ("Itaú").  Itaú is a financial institution located in this District at 540 Madison Avenue, New York, NY 10022.

---

[4] *See* Santander US's website at https://www.santanderus.com/about-us/.
[5] *See*: https://www.santanderus.com/wp-content/uploads/2021/12/reg-155.pdf.
[6] *See:* www.safra.com.

13.     *Itaú CorpBanca* ("Itaú CorpBanca").  Itaú CorpBanca operates as a bank in this District and provides deposits, loans, credit cards, savings, online banking, foreign exchange, and personal data processing services.  Itaú CorpBanca is a financial institution located in this District at 885 Third Avenue, New York, NY 10022.

14.     *Itaú Securities* ("Itaú Securities").  Itaú Securities is a financial institution located in this District at 765 Fifth Avenue, New York, NY 10022.

15.     *CHIPS*.  CHIPS is a financial services institution headquartered in New York, New York.  CHIPS acts as a clearinghouse bank for U.S. dollar-denominated wire transfers between domestic and international banks.

16.     *Federal Reserve Bank*.  The Federal Reserve Bank is a bank headquartered at 33 Liberty Street, New York, NY 10045.  As a provider of the Fedwire Funds Service through its Wholesale Product Officer, the Federal Bank also acts as a wire-transfer clearinghouse for U.S. dollar-denominate wire transfers between domestic and international banks.

**B.  The Klein Family and *Casas Bahia***

Samuel Klein was born in Poland to a Jewish family and survived the Auschwitz concentration camp.  Samuel Klein left Europe in 1951 with his wife, Mrs. Chana Klein, and his first-born son, Michael Klein.  In 1952, Samuel Klein immigrated to Brazil.  *See* Reina Decl. at ¶¶12-13.

Approximately six years after his arrival in Brazil—and after the births of his children— Samuel Klein purchased "*Casa Bahia*," a retail store located at the city center of São Caetano do Sul, a small town in the State of São Paulo.  Samuel Klein was totally devoted to his business, and, less than a decade after opening the first "Casa Bahia" store, he had built a chain of 10 *Casas*

*Bahia* stores.  Michael Klein started to work with his father in 1968, after starting business school.
Petitioner started to work in the family business in 1973.  *See* Reina Decl. at ¶¶14-15.

In the 1970s, Samuel Klain acquired a financial services company and integrated it into the
*Casas Bahia* business, offering credit lines to customers.  Samuel Klein also acquired several
furniture companies that became the sole suppliers of *Casas Bahia*.  The business grew so much
that Pelé, Brazil's most famous soccer player, posed as the *Casas Bahia* brand ambassador.  By
2003, *Casas Bahia* had 340 physical stores in Brazil and had approximately 20 thousand
employees.  Most of the *Casa Bahia* real estate properties were owned by the Klein family, as
Samuel Klein was focused on investing in real estate.  *See* Reina Decl. at ¶¶16-17.

In 2006, Mrs. Chana Klein died of a cancer.  Samuel Klein not only lost his lifetime partner,
but his partner in the *Casas Bahia* business.  Just before Mrs. Klein's passing, she and Samuel
Klein decided to transfer their interest in the family business to their children, Michael Klein,
Petitioner, and Eva Lea Klein Ostrovsky.

## C.  The *Casas Bahia* Sale and Petitioner's Exit from the Family Business

In 2009, the *Casas Bahia* shareholders began negotiations with Pão de Açucar Group, one
of Brazil's largest business groups, regarding the potential sale of *Casas Bahia*.  The potential deal
between both groups only concerned the acquisition by Pão de Açucar Group of *Casas Bahia*'s
retail business and not the real estate properties where the stores were located.  Petitioner did not
agree with the deal structure.  Petitioner truly believed that his father's efforts should be kept and
continued by the siblings.  *See* Reina Decl. at ¶19.  Petitioner left the family business in 2009
because he did not agree with the sale of the family business.  *See* Reina Decl. at ¶19.

With Petitioner's exit from *Casas Bahia*, Samuel Klein purchased Petitioner's shares in the
business.  At this point, Samuel Klein owned 54% in the company's capital stock.  The remainder

of the company's capital stock was split between Michael Klein and Eva Lea Klein Ostrovsky, each one with 23% of the capital stock.  *See* Reina Decl. at ¶20.  Petitioner's exit from the family business led Samuel Klein to equally donate a portion of his assets to his children, Michael, Petitioner, and Eva.  In a 2009 public testament, Samuel Klein donated 2.1 billion Brazilian *reais* equally to his three children.  *See* Reina Decl. at ¶21 and Oliver Decl. at ¶16.  A copy of Samuel Klein's 2009 public testament, together with a sworn translation of it, is attached to the Reina Decl. as **Exhibit 2**.

Also in 2009, in the middle of the negotiations between the Klein family and the Pão de Açúcar Group, Samuel and Michel Klein incorporated a new entity, the "New Casa Bahia," because of the division/split of the original Casa Bahia.  Through such a split, Samuel and Michael Klein decreased *Casas Bahia*'s capital stock to 1,468,899,000 shares and subscribed this stock amount into the New Casa Bahia.  The 1,468,899,000 shares represented the *Casas Bahia*'s retail business portion, leaving the company solely with the management of the real estate properties, where the retail stores operated.  The capital interest of Samuel and Michel Klein in the New Casa Bahia was similar to the old structure, in which Samuel held 53.48% of New Casa Bahia's capital stock, or an equivalent to R$ 1,246,770,966.00, and Michael 46.52%.  *See* Reina Decl. at ¶22.

In October 2010, the New Casa Bahia was incorporated by Globex Utilidades S.A., and ultimately became Via Varejo S.A., currently named Via S.A.  With the closing of the deal, Samuel Klein's interest was diluted by over 25% and reduced to zero in 2013.  With this change, Michael Klein, formerly a minority shareholder, took over the company's control because the 1,084,330,034 shares he owned now represented 55.50% of *Casas Bahia*'s capital stock, while the 869,264,810 shares that were still the property of Samuel Klein only represented 44.50% of the company's capital stock.  Therefore, Michael Klein gained extraordinary powers, which included

the ability to authorize or veto the addition of new shareholders.  A few months later, on August 14, 2013, when Michael Klein's new powers were already in effect, the 135th Amendment to the Articles of Incorporation of *Casas Bahia* was executed.  At the same time, Michael Klein assigned 271 million shares to Altara RK and Altara NK, both companies owned by his two eldest children (Raphael Klein and Natalie Klein).  These companies are headquartered in New Zealand.  Samuel Klein allegedly agreed with such assignments and waived his preemptive right to acquire the assigned shares.  *See* Oliver Decl. at ¶¶17-18.  A copy of the 135th Amendment to the *Casas Bahia* articles of incorporation is attached to the Oliver Decl. as **Exhibit 4**.

On that same date, August 14, 2013, a new will was signed by Samuel Klein at a public notary to replace the one signed in 2009.  With the new will, the disposable share of Samuel Klein's estate, previously assigned to his three children, was divided as follows: 50% for Michael Klein; 25% for Altara RK Investments Limited; and 25% for Altrara NK Investments Limited (companies whose beneficiaries are Michael Klein's children).  The non-disposable share remained equally split among the legitimate heirs: Eva Lea Klein Ostrovsky; Petitioner, and Michael Klein.  Shortly thereafter, on January 31, 2014, the 138th Amendment to the Articles of Incorporation of *Casas Bahia* was signed to add the company Twins-CD, a company registered in New Zealand at the time and controlled by Michael Klein.  Through this amendment, Samuel Klein assigned, free of charge, 434.6 million shares of *Casas Bahia* to Twins-CB.  This number of shares corresponded to half of his interest in *Casas Bahia*.  In practice, the 138th Amendment represented a dilution of Samuel Klein's equity, who was left with 22.25% of *Casas Bahia*'s capital stock.  A copy of the 138th Amendment to the Casa Bahia articles of incorporation is attached he Oliver Decl. as **Exhibit 5**.  *See* Oliver Decl. at ¶¶19-22.

As reported by media articles at that time, Samuel Klein decided to indirectly hold an interest in Via S.A. through holding companies incorporated in foreign jurisdictions, such as EK-VV Limited, Bahia VV RK Limited, Bahia VV NK Limited, Altara RK Investments, and Altara NK Investments.  *See* Reina Decl. at ¶23.  At the same time, different transactions were entered into with foreign companies affiliated with Casa Bahia:

    **i.** In August 2013, Altara RK and Altara NK were added to *Casas Bahia*'s Comercial Ltda. capital stock;

    **ii.** In October 2013, EK-CB Limited was added to *Casas Bahia*'s Comercial Ltda.'s capital stock through an assignment of 542,165,017 shares held by Michael Klein; and

    **iii.** In January 2014, Samuel Klein donated half of his interest in *Casas Bahia* Comercial Ltda. to Twins CB Limited.

Samuel Klein passed away in November 2014 at the age of 91, just after Twins CB Limited was included as part of *Casas Bahia*'s capital stock.  *See* Reina Decl. at ¶¶24-25.  A few days after Samuel Klein's death, on November 28, 2014, a special shareholders' meeting was convened to discuss whether to admit Samuel Klein's heirs as shareholders to replace the deceased shareholder. At the time, the shareholders decided "*... by unanimous vote and without reservations, (...)* **_not to admit_** *the following heirs of the deceased shareholder: Ms. Eva Lea Klein and Mr. Saul Klein*." *See* Oliver Decl. at ¶24.

### D.  Petitioner Uncovers Serious Misconduct Concerning the Sale of Casas Bahia

Several changes made to *Casas Bahia*'s articles of incorporation, all of which benefited Michael Klein, significantly impacted Samuel Klein's assets at the date of his death.  Due to these changes, Samuel Klein, who was formerly the majority shareholder of *Casas Bahia* was left with only 22.25% at the time of his death.  Such changes so close to Samuel Klein's death at the age of

91 was suspicious , so Petitioner retained lawyers and experts to review the corporate documents more thoroughly.  *See* Oliver Decl. at ¶¶25-27.

Petitioner then received an expert report showing that the signatures allegedly attributed to Samuel Klein in the 134th, 135th, 136th, and 138th Amendments to *Casas Bahia*'s articles of incorporation, as well as the second public will signed on August 14, 2013, were forged.  During this period, Michael Klein was responsible for managing the company and for filing hard copies of the corporate documents before the Brazilian registry of commerce.  Furthermore, Michael Klein was the one who benefited the most from the corporate changes to the *Casas Bahia*'s articles of incorporation, as described above.  *See* Oliver Decl. at ¶¶28-29.

If not for the fraudulent amendments to *Casas Bahia*'s articles of incorporation, as well as the changes made to Samuel Klein's will, the following would have been true at the time of his death:

      **i.**    *Casas Bahia*'s capital stock would still be 2.3 billion Brazilian *reais*;

      **ii.**    Samuel Klein's corporate interest in *Casas Bahia* would still be 1.2 billion Brazilian *reais*, representing 55% of the company's capital stock, and he would still be the company's majority shareholder;

      **iii.**    Petitioner would not be prevented from rejoining the corporate structure of *Casas Bahia* after the death of his father;

      **iv.**    Altara RK and Altara NK would not be part of the Probate Proceeding; and

      **v.**    Samuel Klein's disposable assets would have been split only among his children.

Thus, the seemingly forged documents directly affected Samuel Klein's estate, resulting in undue advantage for Michael Klein at the expense of Petitioner and his sister.  Morevoer, prior to

Samuel Klein's death, *Casas Bahia* had historically distributed substantial dividends; but after his death no information was recorded on the distribution of dividends by the company, and no loss was recorded that could justify a lack of profits during the entire period ranging from 2014 to 2023. *See* Oliver Decl. at ¶¶31-33.  This lack of dividends had a direct impact on Samuel Klein's estate split, which in turn had a directly negative impact on Petitioner, an heir.  That is because Samuel Klein's estate was not removed from *Casas Bahia*'s corporate structure, thus entitling the estate to receive dividends, which suddenly were not paid.  The fact that the company did not distribute dividends at the time of the estate's division may have been another fraudulent way of preventing the division of these assets with the other heirs, thus resulting in additional damage to Samuel Klein's estate and causing an enormous difference in Petitioner's portion of his inheritance.

### E.   The Klein Family and its Foreign Presence

As stated previously, Samuel Klein was one of Brazil's most famous businessmen, having built a stellar business reputation with the *Casas Bahia* retail empire.  Additionally, Samuel Klein was a real estate mogul, having purchased hundreds of real estate properties throughout his life. Petitioner was close to his father, but he never knew of foreign investments or foreign assets purchased directly by his father, as well as the magnitude of his father's assets in Brazil.  On several occasions, however, Petitioner witnessed conversations in which his father mentioned foreign financial transactions involving accounts held by him in other jurisdictions.  In fact, during Samuel Klein's last years, in 2013 and 2014, he transferred a significant portion of his assets to foreign companies.  *See* Reina Decl. at ¶¶26-27.

At the end of 2022, Petitioner was suspicious of Michael Klein's role as an executor of his late father's estate.  Petitioner started to notice that his brother was creating unnecessary hurdles for Petitioner to receive his fair share of the inheritance and, therefore, started to question Michael

Klein's potential involvement in concealing the assets of his father estate.  In September 2009, when Samuel Klein first notarized his public will, his assets amounted to a bit more than 2 billion Brazilian *reais*.  However, after five years, and considering the corporate transactions with offshore companies, Samuel Klein passed away leaving less than 500 million Brazilian *reais*, or 25% of what he had five years before.  Petitioner, intrigued by a significant decrease in his father's assets, started to research his father's name, companies, and business in different asset-searching tools. In addition to the foreign transactions detailed above, Petitioner discovered that his father was listed among the 22 Brazilian millionaire businessmen whose names leaked through the Panama Papers.  Specifically, Samuel Klein was the director of Haifa International Corporation, a Panamanian incorporated company that held bank accounts at Santander Private Banking.  *See* Reina Decl. at ¶¶28-30.

After learning of the above facts, Petitioner decided to hire a specialized company to search for his father's assets in foreign jurisdictions.  Given Petitioner's knowledge of his father's connections with the United States, Petitioner hired an American investigation company to initiate these searches.  Additionally, Petitioner knew that his brother kept a close connection with the Unites States, as one of Michael Klein's sons relocated to Miami in the 1990s and was later joined by his siblings, Natalie Klein and Raphael Klein.  To this date, Natalie Klein and Raphael Klein continue to live in Miami.  Petitioner's sister, Eva Lea Klein Ostrovsky, since 2014, relocated with her family to Miami, as well.  *See* Reina Decl. at ¶33.

After hiring a private investigation company to conduct asset searches in public registries in the United States, Petitioner was shocked by the number of companies and assets related to his father.  Petitioner received a report with over 70 limited liability companies incorporated in different U.S. states related to the Klein family.  These companies are incorporated in the states of

Delaware and Florida.  A copy of the list naming each company is attached to the Reina Decl. as **Exhibit 4**.  The connection between these companies and the Klein family is even more apparent when reviewing their registered agent and authorized person, as Alex J. Kurkin is listed as the registered agent for all of them.  Alex J. Kurkin is the same person who is named as the registered agent of Antara NK and Altara NK, as per *Casas Bahia*'s corporate amendment documents.  A copy of the *Casas Bahia* corporate documents is attached to the Reina Decl. as **Exhibit 5**.  *See* Reina Decl. at ¶¶24-35.

## II.   THE FOREIGN PROCEEDINGS

Considering Petitioner's findings and Michel Klein's suspicious conduct as his father's probate executor, Petitioner initiated civil and criminal lawsuits in Brazil to preserve his rights as an heir, in addition to the ancillary proceedings that are currently ongoing as part of the Probate Proceeding.

### A.  <u>The Probate Proceeding</u>

Under Section 1,784 of the Brazilian Civil Code, a probate proceeding should be initiated to distribute the inheritance of the deceased among his heirs.[7]  On January 15, 2015, Michael Klein filed his father's probate proceeding (proceeding nº 1000184-68.2015.8.26.0565) pending before the 4th Civil Chamber of the State Court of São Caetano do Sul (the "Probate Court"), as per sections 610 and 611 of the Brazilian Civil Procedure Code (the "Probate Proceeding").[8]  *See* Reina Decl. at ¶37.  A copy of the initial filing in the Probate Proceeding is attached to the Reina Decl. as **Exhibit 6**.

---

[7] Section 1,784. "Once the probate proceeding is initiated, the inheritance will be transmitted to the legitimate heirs and heirs listed on the will."  Section 610.  If there is a will or an incapable interested party, a judicial probate proceeding shall be initiated.

[8] Section 611. The process of inventory and split must be initiated within 2 (two) months, counting from the opening of the probate proceeding, ending in the following 12 (twelve) months, and the judge may extend these deadlines, ex officio or at the request of a party.

After Samuel Klein's death, Petitioner found out about Samuel's public will dated August 14, 2013.  The public will assigned Samuel's disposable assets (50% of his total assets) under section 1,846 Brazilian Civil Code[9] in the following terms: 50% of the disposable amount was to be directed to Michel Klein; and the other 50% equally to Altara RK and Altara NK.  A copy of Mr. Samuel's public will is attached to the Reina Decl. as **Exhibit 7**.  In addition to the heirs listed on the will, Samuel Klein was also survived by his necessary heirs, as per section 1,845 of the Brazilian Civil Code.  Those heirs are his children, Michael Klein, Petitioner, and Eva Lea Klein Ostrovsky, as he was not survived by his wife.  As per section 1,846 of the Brazilian Civil Code, the necessary heirs are entitled to the remainder of Samuel Klein's assets, or the 50% not assigned by his will.  *See* Reina Decl. at ¶¶38-39.

After the Probate Proceeding was initiated, on February 13, 2015, the Probate Court issued an order naming Michel Klein as his father's estate administrator.  A copy of the Probate Court's order is attached to the Reina Decl. as **Exhibit 8**.  As set forth in section 618 of the Brazilian Civil Procedure Code, the estate administrator is responsible for acting on behalf of the estate actively and passively, and accounting for all assets and rights that were property of the deceased.[10]  However, before the Probate Court issued any rulings on the accounting of the deceased's assets and rights, the heirs reached an amicable resolution concerning their fair shares of Samuel Klein's

---

[9] Section 1,846. It belongs to the necessary heirs, by operation of law, half of the assets of the inheritance, constituting the legitimate.

[10] The estate's administrator shall:
I - represent the estate actively and passively, in or out of court, observing, as to the dative, the provisions of section 75, § 1;
II - manage the estate, guarding the assets with the same diligence as if they were yours;
III - provide the first and last statements in person or by an attorney-in-fact with special powers;
IV - exhibit at a notary's office, at any time, for examination by the parties, the documents relating to the estate;
V - add to the records the will certificate, if any;
VI - bring to the collection the assets received by the absent, resigning or excluded heir;
VII - render accounts of his management when leaving office or whenever the judge determines;
VIII - request the declaration of insolvency.

estate.  On March 12, 2015, Samuel Klein's heirs signed a memorandum of understanding (the "MOU"), which accounted for the assets of the deceased and the general terms of the asset split among the heirs.  A copy of the MOU is attached to the Reina Decl. as **Exhibit 9**.  The Probate Proceeding is still ongoing, and its course depends on, among other issues, the confirmation of the deceased's assets at the time of his death.  *See* Reina Decl. at ¶¶40-42.

As per Petitioner's investigation in the United States, companies incorporated in the states of Delaware and Florida under names such as "Samkle," Mikeone," EK Family," "Klein Motoros," and others have acquired approximately $310 million dollars in real estate properties in the United States between October 2014 and March 2015.  These dates coincide with Samuel Klein's death and the signing of the MOU.  Additionally, these companies share the same registered agent, Alex Kurkin.  Petitioner was never informed about such acquisitions nor the amount of money involved.  Therefore, the documents and information sought in this 1782 Application are relevant and essential for the Probate Court to issue a final decision confirming Samuel Klein's asset at the time of his death, so that an accurate list and description of the assets left by the deceased may be generated and shares may be split among his heirs.  *See* Reina Decl. at ¶43.

B. <u>**The Memorandum of Understanding Entered into Between Samuel's Heirs –**</u>
   <u>***Memorando de Entendimentos***</u>

On March 12, 2015, Michael Klein, Petitioner, Eva Lea Klein Ostrovsky, Altara NK, Altara RK, *Casas Bahia* Comercial Ltda., Centro Eletrônico Marte Avionics Ltda., Hangar Campo de Marte Ltda., Habile Segurança e Vigilância Ltda., and CBEP – Capital Brasileiro de Empreendimentos e Participações Ltda., signed an MOU to split Samuel Klein's assets and rights. The preliminary discussions and negotiations that resulted in the MOU were the following:

      **i.**     Samuel was survived by three legitimate and necessary heirs, his children – Michael Klein, Petitioner, and Eva Lea Klein Ostrovsky, each being entitled to one third of the deceased's assets that have not been assigned through his public will;

      **ii.**    Samuel Klein was survived by three testamentary/will heirs, as per his public will notarized on August 14, 2013 – Michael Klein, Altara NK, and Altara RK;

      **iii.**   Among Samuel Klein's assets are: shares of *Casas Bahia* Comercial Ltda.; Centro Eletrônico Marte Avionics Ltda.; Hangar Campo de Marte Ltda.; Habile Segurança e Vigilância Ltda.; and CBEP – Capital Brasileiro de Empreendimentos e Participações Ltda.  On November 28, 2014, the quota holders of these companies decided, in accordance with the bylaws of each company, that Samuel Klein's heirs were not to be added as shareholders to the companies, and, therefore, their portion of the capital stock should be liquidated.

      **iv.**   Michael Klein, Petitioner, Eva Lea Klein Ostrovsky, Altara NK, and Altara RK understood the terms of the MOU and agreed with the minutes of meetings dated November 11, 2014, of *Casas Bahia* Comercial Ltda., Centro Eletrônico Marte Avionics Ltda., Hangar Campo de Marte Ltda., Habile Segurança e Vigilância Ltda., and CBEP – Capital Brasileiro de Empreendimentos e Participações Ltda.;

      **v.**    At the time the Probate Proceeding was filed, the assets of the deceased totaled R$ 499,061,257.48, or half a billion Brazilian *reais*.  The deceased's assets were comprised of:

(1) Real estate assets in the amount of R$ 3,103,659.087;[11]

---

[11] The real estate properties are: (i) 9/12 of 11 properties located in the municipality of Angra dos Reis, state of Rio de Janeiro, in the total amount of R$ 2,684.416,01; (ii) 12/9 of three properties located in the municipality of Barueri, state of São Paulo, in the amount of R$408,236.54; (iii) 9/12 of a property located in the municipality of Iguape, state of São Paulo, in the amount of R$3,325.45; (iv) 12/9 of a property located in the municipality of Ilha Comprida, state of São Paulo, in the amount of R$7,681.08.

(2) Financial investments in the amount of R$ 51,489,804.95;

(3) 434,673,554 shares of *Casa Bahias* Comercial Ltda.'s capital stock, in the amount of R$ 422,309,825.06;

(4) 20,108,897 shares of Hangar Campo de Marte Ltda.'s capital stock, in the amount of R$ 68,546.22;

(5) 150.000 shares of Habile Assessoria e Consultoria em Serviços Ltda.'s capital stock, in the amount of R$ 80,366.95;

(6) 5.000 shares of CBEP – Capital Brasileiro de Empreendimentos e Participações Ltda.'s capital stock, in the amount of R$ 2,620.96;

(7) 23.793.511 shares of Centro Eletrônico Marte Avionics Ltda.'s capital stock, in the amount of R$ 22,012,779.59.  *See* Reina Decl. at ¶45.

Considering such asset accounting and description, the deceased's heirs agreed to the following division:

| | |
|---|---|
| Probate's Total Assets | R$ 499,061,257.48 |
| Deceased's Assets Assigned to Petitioner | R$ 300,408,236.54 |
| Deceased's Assets Assigned to Eva Klein | R$ 84,075,350.43 |
| Deceased's Assets Assigned to Michael Klein | R$ 72,116,435.80 |
| Deceased's Assets Assigned to Altara RK | R$ 21,230,617.36 |
| Deceased's Assets Assigned to Altara NK | R$ 21,230,617.36 |

*See* Reina Decl. at ¶46.

Petitioner's share of his deceased father's assets would be composed of:

i. The total of real estate properties located at the Barueri municipality in the state of São Paulo;

        ii. R$ 40,000,000.00 of the amounts held in financial investments that were owned by deceased;

        iii. R$ 256,305,947.71 of Casa Bahia's capital stock;

        iv. R$ 11,424.37 of Hangar's capital stock;

        v. R$ 13,394.49 of Habile's capital stock;

        vi. R$ 3,668,796.60 of CEMA's capital stock;

        vii. R$ 436.83 of CBEP's capital stock.

Aside from the amount concerning the real estate properties, the other amounts would be paid to Petitioner over 10 years, from the date the Probate Court issued the formal asset split in the Probate Proceeding. In other words, Petitioner's ability to receive his shares of the deceased's assets is subject to the finality of the Probate Proceeding. However, the other heirs have had full possession and title of their inheritance assets assigned to them through the MOU since the Probate Proceeding was filed in January 2015. Also, aside from the asset split, the MOU also regulates other issues, such Petitioner's acknowledgement of the validity of his father's legal actions while he was still alive, such as:

        i. Donations made in 2013 by the deceased to EK-VV Limited, NK-VV Limited, and RK-VV Limited;

        ii. Donations made in 2014 by the deceased to Twins CB;

        iii. Any other donations that were made by the deceased while he still lived.

*See* Reina Decl. at ¶¶47-49

Additionally, the MOU did not incorporate or make reference to any documents concerning these donations. Petitioner did not have access to a single document referring to these donations or the beneficiaries to the donations Samuel Klein made while still alive. It is also worth

highlighting the conditions set forth in section 5.1 of the MOU.  This section states that Michael

Klein, as his late father's probate administrator, must act with his best efforts to seek judicial

approval of the MOU, as well as for the issuance of the Probate Court's formal asset split order.

The parties to the MOU notarized the terms set forth in the MOU in a public deed before the 4th

Notary of the Municipality of São Caetano do Sul, incorporating the same provisions of the MOU.

*See* Reina Decl. at ¶¶50-52.  A copy of the public deed is attached to the Reina Decl. as **Exhibit

10**.

> Considering the lapse of almost 7 years since the Probate Proceeding was filed, Petitioner

started to take action to monitor his brother.  As per section 618, item VII, of the Brazilian Civil

Procedure Code, Petitioner initiated actions to monitor his brother's role as the estate's

administrator, such as starting a campaign to formally investigate which assets were actually

owned and acquired by his late father during his life, as well as any changes to his testamentary

documents during the years before he passed away.  Petitioner knew that his father was very ill

two years before he passed, which impacted his ability to be part of the family business.

**C.**  **The Accounting Proceeding – *Ação de Prestação de Contas***

> On May 11, 2020, in compliance with an order from the Probate Court, Michael Klein

initiated an accounting proceeding (proceeding nº 1002810-84.2020.8.26.0565) pending before

the Probate Court to account for his years as the estate's administrator (from 2015 to January

2020).  All heirs are parties to this accounting proceeding.  Only documents related to the

properties owned by the estate were attached, without, however, presenting any information

regarding the companies and any income received as dividends, nor information on companies or

assets located abroad.  For the purposes of this proceeding, Michael Klein only produced to the

Probate Court documents related to his father's assets located in Brazil.  *See* Reina Decl. at ¶¶58-60.

Michael Klein, however, was asked about his late father's foreign assets, as a revised income statement from Samuel Klein, dated for the 2017 fiscal year, showed significant additions to his assets due to an asset repatriation incentive given by the Brazilian federal government for wealthy individuals to declare their foreign assets in Brazil.  Michel Klein denied the existence of such assets, stating that his father's estate was limited to R$ 499 million.  On that occasion, the Probate Court accepted the arguments made by Michael Klein, which claimed that his late father held no assets in foreign jurisdictions.  To support his claim, Michael Klein produced Samuel Klein's income statement without the 2017 revisions, showing that no assets were held abroad. *See* Reina Decl. at ¶¶61-62.  A copy of Mr. Samuel Klein's income statement is attached to the Reina Decl.as **Exhibit 11**.

The Accounting Proceeding is ongoing and in a procedural stage that Petitioner and other heirs can still introduce evidence to show that Michael Klein, as the estate's administrator and in control of the financial investments Samuel Klein held at the time of his death, concealed foreign assets from the Probate Proceeding.  Samuel Klein's assets at the time of his death were not limited to R$ 499 million Brazilian *reais*.  Petitioner knows that Michael Klein's arguments, as represented to the Probate Court, were not accurate.  However, due to jurisdictional limitations, neither the Probate Court nor other Brazilian courts have subpoena powers to compel foreign parties to produce documents, and, therefore, no foreign asset tracing tools fall within the Brazilian court's subpoena powers.  That is the reason Petitioner opted to file this Application.  *See* Reina Decl. at ¶¶63-64.

**D.** **The Preliminary Discovery Proceedings – "*Ação de Produção Antecipada de Provas*"**

On March 4, 2023, Petitioner filed a preliminary discovery lawsuit seeking to obtain evidence from Michael Klein and *Casas Bahia*—specifically, accounting documents from 2012-2013.  A copy of the preliminary discovery proceeding is attached to the Reina Decl. as **Exhibit 12**.  On April 12, 2023, the court granted Petitioner's request.  A Portuguese copy of the decision is attached to the Reina Decl. as **Exhibit 13**.  On May 3, 2023, Michael Klein and *Casas Bahia* filed an opposition to Petitioner's request, without producing any documents as ordered by the court.  As of the filing of this Application, Petitioner still awaits an order authorizing a search and seizure at *Casas Bahia*'s headquarters of the accounting documents Petitioner seeks.  *See* Reina Decl. at ¶¶69-71.

On April 17, 2023, Petitioner filed another preliminary discovery proceeding seeking documents from his father's estate.  Petitioner seeks documents concerning donations made by his father in 2013, just before his death.  The MOU signed in March 2015 lists Samuel Klein's donations to EK-VV, NK-VV, and RK-VV, in 2013.  However, Petitioner never had access to any documents concerning such donations.  In other words, Petitioner does not know which assets or amounts were donated, who received such assets, or if the donations were, in fact, legitimate.  In addition to the lack of information, media reports from 2013 concerning *Casas Bahia*'s corporate restructuring state that Samuel Klein decreased his corporate interest in Casas Bahia from 25.1% to zero.  This transaction alone significantly impacted Samuel Klein's total assets and Petitioner's inheritance share.  On March 27, 2023, the district judge subpoenaed the estate, through Michael Klein, to produce the documents Petitioner seeks.  On May 15, 2023, Michael Klein filed his opposition, even though the Brazilian Civil Procedure Code bars such defense.  Petitioner awaits a decision of the court.  *See* Reina Decl. at ¶¶72-75.

### E.  **The Criminal Investigation**

Petitioner is in possession of expert evidence showing that Samuel Klein's signatures in relevant corporate amendments of *Casas Bahia* were forged.  Considering that Michael Klein and his children were the beneficiaries of those corporate transactions, there are strong indications that Michael Klein may have committed the crime of embezzlement under Brazilian law.  Under Brazilian criminal law, Michael Klein can be charged with the crime of embezzlement, as set forth in Section 171 of the Brazilian Penal Code.  Petitioner, as the victim of his brother's conduct, filed a formal complaint with the 78th Police District of São Paulo (the "Criminal Authority") to initiate a criminal investigation in accordance with Section 5, item II, of the Brazilian Code of Criminal Procedure.  *See* Oliver Decl. at ¶¶36-40.  A copy of the formal complaint is attached to the Oliver Decl.as **Exhibit 6**.

The allegations of embezzlement are based on potential fraudulent amendments to *Casas Bahia*'s articles of incorporation and Samuel Klein's will that significantly changed his assets on the date of his death—November 20, 2014—thus directly harming Petitioner.  On June 7, 2023, the Criminal Authority granted Petitioner's request and ordered the immediate initiation of a criminal investigation under the following terms "*considering the seriousness of the facts reported in the application, as well as the findings in the retained expert's opinions presented, I see a probable cause that the crime of theft by deception has been committed by Michael Klein. I order that a police investigation be initiated to examine the circumstances.*"  *See* Oliver Decl. at ¶¶39-40.  A copy of the decision issued by the Brazilian Criminal Authority is attached to the Oliver Decl. as **Exhibit 7**.

As already stated by the Criminal Authority, indications were found that the crime of embezzlement may have occurred, with possible misappropriation of amounts owned by Samuel

Klein, which would have resulted in Michael Klein's unjust enrichment. Thus, the evidence Petitioner seeks here is relevant for investigating the path of money both in Brazil and abroad, as well as for gathering evidence that may prove Michael Klein's intention to commit the crime. Petitioner needs to obtain information showing that his father's assets have been siphoned off and concealed after his death. Access to the required information is important to support and better understand the facts investigated in the criminal investigation. *See* Oliver Decl. at ¶¶47-49.

### F. **The Contemplated Proceedings**

Petitioner was deceived regarding the assets listed on the MOU, which do not correspond to the estate's assets that were actually under Michael Klein's administration. If Petitioner had knowledge of the total amount of assets held by his late father at the time of his death, Petitioner would never have agreed to sign the MOU.

Therefore, after Petitioner understands the magnitude of his late father's assets at the time of his death, as set forth in section 138 of the Brazilian Civil Code, Petitioner will file an annulment lawsuit with the State Court in São Caetano do Sul arguing that he was deceived and induced to error when signing the MOU. Petitioner intends to annul the MOU and any effect it had on the Probate Proceeding. *See* Reina Decl. at ¶¶79-80.

Additionally, Section 618, item III, of the Brazilian Civil Procedure Code expressly obligates the estate's executor/administrator to list all assets left by the deceased in a final declaration submitted to the Probate Court. If mismanagement is proven, an executor can be left without his rights to the assets he concealed. However, to show to the Probate Court that Michael Klein acted to conceal his father's estate assets, Petitioner needs to show that his father had foreign assets at the time of his death—assets that were potentially concealed. Petitioner cannot obtain such evidence through Brazilian financial institutions or other government entities, such as the

Brazilian Central Bank, because these entities do not hold information from foreign affiliates or have information about foreign transactions.  *See* Reina Decl. at ¶¶81-83.

For this reason, Petitioner needs the assistance of this Court to identify assets (in the form of interest in companies, real estate assets, and others) held by his father before his death and at the time the Probate Proceeding was initiated, so that Petitioner can pursue all available legal mechanisms under Brazilian law.  *See* Reina Decl. at ¶¶84-85.

### G. <u>Respondents Possess Highly Material Information For Use in Foreign Proceedings</u>

Petitioner needs the judicial assistance of this District to show Michael Klein's wrongdoing to the Brazilian courts.  Upon information and belief, Michael Klein fraudulently transferred a significant amount of assets from his father's estate and assets that were still property of Samuel Klein while alive.  Petitioner was deprived of his fair share of his father's estate.  As discussed, Petitioner found out that, between October 2014 (one month before Samuel Klein's death) and March 2015 (when Michael Klein sent the MOU), U.S. entities incorporated either by Samuel Klein, Michael Klein and/or Eva Lea Klein Ostrovsky in the states of Delaware and Florida purchased approximately $310 million dollars in real estate properties in the United States.

Therefore, Petitioner needs to obtain financial documents from financial institutions located within this District that corroborate his suspicions.  Petitioner seeks financial documents relating to the bank accounts opened under his father's name, as well as companies incorporated in the U.S. and whose owners are Samuel Klein, Michel Klein, Michael's children, and Eva and her children.

Respondents CHIPS and the Federal Reserve Bank (as a provider of the Fedwire Funds Service through its Wholesale Product Office) are wire-transfer clearinghouses located in this District that act as clearinghouse banks for U.S. dollar-denominated wire transfers between

domestic and international banks.  As the U.S. entities that process and settle wire transfers between domestic and international banks, these Respondents almost certainly possess information relating to wire transfers from the estate, including Michael Klein's accounts, to other accounts, including any controlled by Michael Klein and U.S. companies related to him.  It is impossible for Petitioner to identify these transfers without obtaining discovery from Respondents.

The Respondents are therefore likely to be in possession, custody, and control of information highly material to the Foreign Proceedings and Contemplated Foreign Proceeding. This information would be relevant to Petitioner's Brazilian claims, as further explained in the Reina and Oliver declarations filed in support of the 1782 Application.

## ARGUMENT

Section 1782 authorizes federal district courts to order discovery to assist petitioners like Petitioner in obtaining evidence in the United States for use in foreign legal proceedings.  An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

After determining that the three statutory requirements are satisfied, courts must then consider four discretionary factors in deciding whether to grant a Section 1782 application: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request

conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004).

Moreover, courts in this circuit "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A. v. R. Esmerian*, Inc., 51 F.3d 1095, 1097 (2d Cir. 1995). Both the Supreme Court and the Second Circuit have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

## I.   PETITIONER SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782.

### A.   <u>Respondents are Found in the District</u>

Respondents are present in the Southern District of New York because they are organized under the laws of New York and/or have offices that operate in the district. *Hertz Corp. v. Friend*, 559 U.S. 77, 81, 93 (2010) (holding that a corporation's principal place of business "should normally be the place where the corporation maintains its headquarters"); *Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*, No. 17MC521, 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018) (noting that a corporation is found in the district where it is "essentially at home"); *Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*, No. 17-MC-00216 (VEC), 2017 WL 3841874, at *3 (S.D.N.Y. Sept. 1, 2017) ("[A] corporation is 'at home' for the

purpose of constitutional due process only in a state that is the corporation's place of incorporation or its principal place of business.") (*quoting Daimler AG v. Bauman*, 571 U.S. 117, 139 n. 19 (2014)) (emphasis added); *In re Lane*, No. 22 MISC. 34 (LGS), 2022 WL 16737132, at *2 (S.D.N.Y. Nov. 7, 2022) (holding that respondents headquartered in Manhattan reside or are found under Section 1782).

Respondents have long standing and long established connections to the Southern District of New York and all have branches, are headquartered and/or have been incorporated in New York.

Therefore, the Respondents are found within the Southern District of New York for this requirement of Section 1782. Accordingly, this statutory factor is satisfied.

**B.** **Discovery Sough if "For Use" In Foreign Proceedings**

The information sought in the proposed Subpoenas is "for use" in the Foreign Proceedings and Contemplated Foreign Proceedings. At the outset, the Foreign Proceedings and Contemplated Proceedings qualify as proceedings in a "foreign or international tribunal" for purposes of Section 1782. Indeed, numerous courts have found that civil proceedings (including probate proceedings) before Brazilian courts satisfy Section 1782's requirements. *See, e.g.*, *In re Klein*, No. 20-MC-203 (PKC), 2022 WL 14786787, at *1 (S.D.N.Y. Oct. 26, 2022) (authorizing §1782 discovery for use in Brazilian probate and inventory proceedings relating to "a long-running, intra-family dispute about which assets should properly be included in the estate of the [testator]"); *In re Pimenta*, 942 F. Supp. 2d 1282 (S.D. Fla. 2013) (authorizing 1782 discovery for use in secondary estate distribution proceeding in Brazil probate court); *In re Lane*, No. 22 MISC. 34 (LGS), 2022 WL 16737132, at *2 (S.D.N.Y. Nov. 7, 2022) (authorizing 1782 discovery to, inter alia, determine the location of partnership assets, for use in Brazilian civil proceedings). [12] Likewise, Petitioner's

---

[12]   Further, the Brazil Proceedings are adjudicative proceedings "in a foreign or international tribunal" for purposes of Section 1782 because, the Brazilian courts overseeing the Brazilian proceedings are first instance decision-makers

requested discovery is "for use" in the Foreign Proceedings and Contemplated Foreign Proceedings.  Under Second Circuit law, Petitioner is not required to show that the information sought would be discoverable or admissible in the Foreign Proceedings and Contemplated Foreign Proceedings.  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application.").  Rather, petitioners only need to show that it has "the *practical ability* . . . to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).  Besides, it is not necessary that the proceeding is pending, and it is authorized that courts grant discovery if the proceeding is "within reasonable contemplation".[13]  Even though proceedings have not yet begun, "§ 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings. *Intel, 542 U.S. at 260–61* (2004). There is also no requirement that the proceedings be imminent. *Id.* As the *Intel* court explained, all that is necessary is that the evidence may be eventually used in such a proceeding. *Id.*"[14].

Therefore, even though a proceeding is not pending, courts[15] have granted applications pursuant to Section 1782 when petitioner demonstrates that the evidence sought is enough to support a future potentially contemplated proceeding.

---

tasked with resolving evidentiary disputes, collecting and reviewing evidence in order to resolve those disputes, and permitting certain of its decisions to be appealed and become subject to further review. *Intel*, 542 U.S. at 257, 259.

[13] *Mees*, 793 F.3d at 291, 299, (quoting *302 Intel, 542 U.S. at 259, 124 S.Ct. 2466). "[A] § 1782 applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P., 798 F.3d 113, 124 (2d Cir. 2015).* The applicant "must provide some objective indicium that the action is being contemplated ... [and] the proceedings cannot be merely speculative." *Id. at 123-24.*".

[14] *Pinchuk v. Chemstar Prod. LLC, No. 13-MC-306-RGA,* 2014 WL 2990416, at *2 (D. Del. June 26, 2014).

[15] 542 U.S. 241, 259, 124 S. Ct. 2466, 2480, 159 L. Ed. 2d 355. "In short, we reject the view, expressed in *In re Ishihara Chemical Co.*, that § 1782 comes into play only when adjudicative proceedings are "pending" or "imminent."

Petitioner plainly satisfies this requirement here.  As explained above, and in the Oliver and Reina declarations, the information sought in the Subpoenas is highly material and relevant to the Foreign Proceedings and Contemplated Foreign Proceedings.[16]  Petitioner will use the evidence sought here to further support his allegations and claims in the Foreign Proceedings and Contemplated Foreign Proceedings.[17]

### C.  Petitioner is an "*Interested Person*."

Finally, Section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the Foreign Proceedings.  While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see* Certain Funds, Accounts &/or *Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004).  Petitioner is a legitimate heir, son of Samuel Klein and a party to the Foreign Proceedings and Contemplated Foreign Proceedings, and is therefore are an "interested person" under Section 1782.

### II.  ALL OF THE DISCRETIONARY FACTORS OF SECTION 1782 WEIGH IN FAVOR OF PERMITTING THE DISCOVERY PETITIONER SEEKS.

Once the statutory requirements of Section 1782 have been met, courts next use their discretion in granting discovery by considering four factors set forth by the Supreme Court in *Intel*: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding";

---

*See 251 F.3d, at 125* (proceeding must be "imminent—very likely to occur and very soon to occur" (internal quotation marks omitted)). Instead, we hold that § 1782(a) requires only that a dispositive ruling by the Commission, reviewable by the European courts, be within reasonable contemplation. *See Crown Prosecution Serv. of United Kingdom, 870 F.2d, at 691; In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago, 848 F.2d 1151, 1155, and n. 9 (C.A.11 1988); Smit, International Litigation 1026* ("It is not necessary ... for the [adjudicative] proceeding to be pending at the time the evidence is sought, but only that the evidence is eventually to be used in such a proceeding.")".

[16]  Reina Decl., ¶88-89; Oliver Decl. ¶¶47-49
[17]  Reina Decl., ¶¶90-92; Oliver Decl. ¶¶50-52

(2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) whether the application conceals an attempt to circumvent foreign proof-gathering restrictions or other policies; and (4) whether the discovery sought is unduly intrusive or burdensome.[18] In considering these factors, courts should exercise their discretion "liberally in favor of granting discovery." [19] In this case, all four factors favor allowing discovery.

Furthermore, when exercising their discretion, courts should consider the twin aims of Section 1782, namely, "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."[20]

## A.  The First *Intel* Factor Favors Granting Discovery Because Respondents Are Not Parties to the Foreign Proceedings

The first *Intel* factor considers whether the requested discovery is sought from a participant in the foreign case.[21]  Pursuant to *Intel*, this first factor favors Petitioner where the respondent is not a participant in the foreign proceeding.[22]  As the Supreme Court and several lower courts have recognized, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."[23]

---

[18] 542 U.S. at 264-65.

[19] See *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability.")

[20] *KPMG, L.L.P.*, 798 F.3d at 117

[21] *In Re Pishevar*, 439 F. Supp. 3d 290, 303 (S.D.N.Y. 2020) (Citing *Intel*).

[22] *Intel*, 542 U.S. at 264.

[23] *Id.*; see e.g., *In re Imanagement Servs. Ltd.*, No. Misc. 05-89 (FB), 2005 WL 1959702, at *3 (E.D.N.Y. Aug. 16, 2005) (favoring discovery where targets were not parties to the foreign action, because "their evidence, available in the United States, may be unobtainable absent § 1782(a) aid").

Here, the Respondents are not parties to the Foreign Proceedings and will not be parties to the Contemplated Foreign Proceedings in Brazil and are beyond the subpoena powers of Brazilian courts.24   Therefore, there is no seeable danger in obtaining evidence from the financial institutions in New York, since obtaining the evidence will in no way disrupt or interfere with the Foreign Proceedings.

The first *Intel* factor therefore weighs in favor of discovery.

## B.  The Second *Intel* Factor Favors Granting Discovery Because the Brazilian Courts Will Be Receptive to the Requested Discovery.

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to evidence obtained through Section 1782.  *See In re Application of OOO Promnesftstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing the second *Intel* factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782").  There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States, with the Second Circuit holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995).  A court should deny discovery on the basis of lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782."  *Id.* at 1100 (emphasis added).  *See In re Safra*, 2022 WL 3584541, at *5 ("objection to U.S. federal-court judicial assistance would have to come from an official source, such as an agent of the [foreign]

---

24   Lehmann Decl., ¶93.

government."); *Schmitz*, 376 F.3d at 84 (district court denied discovery request where German Ministry of Justice and local German prosecutor explicitly asked district court to deny it).

The Brazilian courts would be receptive to evidence sought here.  *See* Reina Decl. ¶¶90-91, and Oliver Decl. ¶¶50-51.  Therefore, the second *Intel* factor is met and gives a strong favoring for Petitioner.

**C.   The Third *Intel* Factor Favors Granting Discovery Because The Application Is Made in Good Faith and Does Not Circumvent Any Proof-Gathering Restrictions.**

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  The *Intel* Court expressly rejected the notion that Section 1782 requires that the evidence sought must be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad.  *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("While *Intel* concerned the discoverability of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in the foreign proceeding.  As in *Intel*, there is no statutory basis for any admissibility requirement."); *Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts.").  Nor is there any requirement that Petitioner must exhaust his remedies in the foreign court first.  *See In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion requirement' finds no support in the plain language of the statute and runs counter to its express purposes.").

Here, there is no reason to believe that any of the discovery sought violates any foreign laws and/or public policy.  Indeed, Brazilian laws do not prohibit the collection of information sought via this Application.[25]  Brazil does not have any law or public policy against such discovery. Accordingly, the third *Intel* factor weighs heavily in favor of granting Petitioner's Application.

## D.  The Fourth *Intel* Factor Favors Granting Discovery Because The Requests Are Narrowly-Tailored and Proportional to The Needs Of The Foreign Proceedings.

The fourth *Intel* factor favors the petitioner if the requests for discovery are not overly burdensome or duplicative.[26]  In evaluating the scope of a Section 1782 request, the court applies the "familiar standards" of the Federal Rules of Civil Procedure and are encouraged to issue a "closely tailored discovery order rather than… simply denying relief outright."[27]  Where, as here, a Petitioner's requests concern "the precise subject matter of the underlying litigation," the requests are not unduly burdensome.[28]

Petitioner's limited discovery request seeks documents relating to estate mismanagement and transfer of property of the estate that had occurred by Michel Klein through the intermediation and services offered by Respondents, while avoiding unnecessary burden or intrusion upon them. As a result, the requested discovery is appropriate.

A copy of the subpoena that the Petitioner intends to serve on the Respondents is attached hereto, together with the proposed order.  The potential burden and expense of compliance would be minimal because the requested discovery implicates a discrete universe of documents relating to financial transactions.

---

[25]Reina and Oliver Decl..

[26] *Intel*, 542 U.S. at 265.

[27] *In re Top Matrix Holdings Ltd.*, No. 18 MISC. 465 (ER), 2020 WL 248716, at *7 (S.D.N.Y. Jan. 16, 2020).

[28] *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998); see, e.g., *Veiga*, 746 F. Supp. 2d at 25 (granting a Section 1782 application where "the subject matter of the requests are reasonably tailored to speak to the claims and defenses raised in the proceedings at issue").

The relevant documents should thus be easily identifiable, readily accessible, and not burdensome for Respondents to produce. In the unlikely event, however, that this Application and the desired discovery create a burden or other issues for one of the Respondents, Petitioner would be more than willing to accommodate and confer with them to resolve any such issues in good faith.

## III.    THIS APPLICATION SHOULD BE GRANTED *EX PARTE*

Finally, the Court should grant Petitioner's Application on an *ex parte* basis. Courts in this Circuit and across the country have recognized that Section 1782 applications made on an *ex parte* basis are properly filed and routinely granted.[29] Such applications are "customarily received and appropriate action taken with respect thereto *ex parte*," because "witnesses can ... raise[] objections and exercise[] their due process rights by motions to quash the subpoenas."[30] Here, Petitioner request that its *ex parte* Application be granted without prejudice to Respondents' rights to move to vacate this Court's approval order and/or quash the subpoenas Petitioner would issue thereunder.

---

[29] *See e.g.*, *Esses v. Hanania (In re Esses)*, 101 F.3d 873, 874 (2d Cir. 1996) (affirming grant of ex parte order under Section 1782); *In re Application of Gianoli*, 3 F.3d 54, 55 (2d Cir. 1993) (same); *see also In re Mota*, No. MC 19-00369 (MN), 2020 WL 95493, at *1 (D. Del. Jan. 8, 2020) ("Discovery applications under § 1782 are often granted *ex parte*"); *In re Request for Int'l Jud. Assistance From the Nat'l Ct. Admin. of the Republic of Korea*, No. C15-80069 MISC LB, 2015 WL 1064790, at *2 (N.D. Cal. Mar. 11, 2015) ("An *ex parte* application is an acceptable method for seeking discovery pursuant to § 1782.").

[30] *In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1219 (9th Cir. 1976); *see also Gushlak v. Gushlak*, 486 F. App'x 215 (2d Cir. 2012) ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."); *In re Letter of Request from Supreme Court of Hong Kong*, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991) ("Indeed, such *ex parte* applications are typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request, and will then have the opportunity to move to quash the discovery or to participate in it."); *In re Gemeinschaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 U.S. Dist. LEXIS 94161, at *1 (S.D.N.Y. Dec. 29, 2006) (denying motion to quash subpoena issued ex parte under 1782).

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the *Ex Parte* Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order attached hereto as Exhibit A, (c) authorize Petitioner, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas on Respondents; and (d) grant any and all other relief to Petitioner as deemed just and proper.


Dated:    June 28, 2023                     Respectfully submitted,

                                                     **MB SCANLON PLLC**

                                                     */s/ Gabriela Menna Barreto Scanlon*
                                                     Gabriela Menna Barreto Scanlon
                                                     4301 50th Street NW, 1st Floor
                                                     Washington, D.C., 20016
                                                     Telephone:  (202) 410-9293
                                                     Email: gabriela@mbscanlon.com

                                                     *Attorney for Petitioner Saul Klein.*