UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*IN RE EX PARTE APPLICATION OF SAUL KLEIN*

23 Misc. 211 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

"Happy families are all alike; every unhappy family is unhappy in its own way."[1]  And
then there are the families whose discord and recriminations are such as to spawn legal action
spanning international boundaries.

This case involves an application under 28 U.S.C. § 1782 for foreign discovery regarding
alleged mismanagement of the estate of family patriarch Samuel Klein,[2] a Brazilian domiciliary.
Ongoing probate proceedings in Brazil pit Samuel's children against one another.  The petitioner
here, Saul Klein, alleges that his brother, Michael Klein, as administrator of their father's probate
proceeding and executor of their father's estate, deceived him as to the value of their father's
offshore assets in order to "deprive[] [him] of his rightful inheritance." Dkt. 2 at 2.  Saul here
seeks records from U.S. financial institutions of transactions made on his father's behalf, and
transactions by his siblings, Michael and Eva Klein.  Saul proposes to use these records in the
probate proceeding in Brazil, and in civil and criminal lawsuits against Michael in Brazil.

---

[1] LEO TOLSTOY, ANNA KARENINA 1 (Constance Garnett trans., Modern Library 1996) (1878).

[2] For ease of reference, the Court will refer to members of the Klein family by their first names.

The Court initially granted, as facially supported, Saul's *ex parte* application under § 1782 for authority to issue subpoenas *duces tecum* to the U.S. institutions. Dkt. 6. Now before the Court are two motions to quash those subpoenas. One is from Michael and entities he and Eva own and control (together, "the first movants"). Dkt. 29. The second is from entities owned and controlled by Michael's children, Raphael and Natalie Klein (together, "the second movants"). Dkt. 37. For the reasons that follow, the Court grants both motions and quashes the subpoenas.

## I.     Background[3]

### A.     Facts

#### 1.     The Death of Samuel Klein

Born in Zaklików, Poland in 1923, Samuel witnessed firsthand the ravages of World War II. His mother and five of his nine siblings died in Treblinka. Reina Decl. ¶ 12. He was sent to a forced labor camp; in 1944, while being transported to Auschwitz, he managed to escape. *Id.* ¶ 12; *see also* Lawrence Bush, *Samuel Klein's Casas Bahia Empire*, JEWISH CURRENTS (Nov. 15, 2016), https://jewishcurrents.org/samuel-kleins-casas-bahia-empire. In 1952, after years in

---

[3] The facts which form the basis of this decision are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motion—specifically, Saul's petition, Dkt. 2 ("Pet."), and the attached declarations of Kátia Vilhena Reina, Dkt. 4 ("Reina Decl."), and Luiza A. Vasconcellos Oliver, Dkt. 5 ("Oliver First Decl."); the first movants' brief, Dkt. 30 ("First Movants' Br."), and the attached declaration of Carlos Portugal Gouvêa, Dkt. 31, Ex. 1 ("Gouvêa Decl."); Saul's brief in response to the first movants, Dkt. 33 ("Saul's First Br."), and the attached declarations of Luiza A. Vasconcellos Oliver, Dkt. 35 ("Oliver Second Decl."), and Mitch Jacobs, Dkt. 36 ("Jacobs Decl."); the second movants' brief, Dkt. 38 ("Second Movants' Br."), and the attached declarations of Lucas V. M. Bento, Dkt. 40 ("Bento Decl."), Flávio Luis Yarshell, Dkt. 41 ("Yarshell Decl."), and Pierpaolo Cruz Bottini, Dkt. 42 ("Bottini Decl."); Saul's brief in response to the second movants, Dkt. 45 ("Saul's Second Br."), and the attached declarations of Francisco Rezek, Dkt. 46 ("Rezek Decl."), and Alberto Zacharias Toron, Dkt. 47 ("Toron Decl."); and the second movants' reply brief, Dkt. 48 ("Second Movants' Reply Br."), and the attached declarations of Eduardo Secchi Munhoz, Dkt. 49 ("Munhoz Decl."), and Aldo Romani Netto, Dkt. 50 ("Netto Decl.").

European refugee camps, he emigrated to Brazil, where he traveled door-to-door selling sheets, tablecloths, and towels from a pushcart. Reina Decl. ¶¶ 13–14. Years of saving led to the purchase in 1958 of a small retail store ("Casa Bahia") in an industrial suburb on the outskirts of São Paulo. *Id.* From one store came hundreds more. By the early 2000s, Casa Bahia had become Brazil's largest retail chain, with tens of thousands of employees nationwide. *Id.* ¶¶ 15–17. And Samuel had become one of Brazil's wealthiest men, with a net worth exceeding several billion Brazilian reais (then approximately $1.5 billion USD). *Id.* ¶¶ 17, 21. He also kept dark secrets. He has been accused of assaulting dozens of underage girls throughout his tenure at Casa Bahia: civil lawsuits remain pending against his estate; others have settled for undisclosed sums. *See generally* Ciro Barros et al., *As Acusações Não Reveladas de Crimes Sexuais de Samuel Klein Fundador da Casa Bahia* [*The Undisclosed Accusations of Sexual Crimes of Samuel Klein, Founder of Casa Bahia*], AGÊNCIA PÚBLICA (Apr. 15, 2021, 6:00 A.M.), https://apublica.org/2021/04/as-acusacoes-nao-reveladas-de-crimes-sexuais-de-samuel-klein-fundador-da-casas-bahia/.

In November 2014, at age 91, Samuel died. Reina Decl. ¶ 25. He was survived by his three children (in birth order, Michael, Saul, and Eva) and several grandchildren (including Michael's children, Natalie and Raphael). *Id* ¶¶ 25, 38–39. At the time of his death, Samuel used a complex web of foreign holding companies (including Altara RK, Altara NK, Bahia RK, and Bahia NK, all incorporated in the Cayman Islands) to manage his ownership interest in Casa Bahia. At one point, both Saul and Michael worked for Casa Bahia; by the time Samuel died, Saul had left Casa Bahia, and Michael was in charge. *See id.* ¶¶ 19–24.

**2.      The Initial Brazilian Proceedings**

In January 2015, Michael filed a probate proceeding in a local Brazilian court to distribute Samuel's estate. *See id.* ¶ 9; *see also id.*, Ex. 3 at 1–10 (translation of initial petition in Brazilian probate court). Michael was appointed administrator of the proceeding and executor of the estate, requiring him to "represent" and "manage" his father's estate, "protecting its assets with the same care as if they were his or her own." Art. 618, Código de Processo Civil ("Code of Civil Procedure"); *see also* Reina Decl. ¶ 40; Yarshell Decl. ¶ 19 n.4; Rezek Decl. ¶ 17.

The initial proceedings focused on Samuel's last will and testament, dated August 14, 2013. Under Brazilian law, half of Samuel's estate (the "forced portion") was required to pass in equal shares to his "necessary heirs" (his three children). His will allocated the remainder (the "disposable portion") as follows: 50% to Michael; 25% to Altara RK (to benefit Michael's son, Raphael); and 25% to Altara NK (to benefit Michael's daughter, Natalie). Reina Decl., Ex. 3 at at 26–30 (Samuel's will); *see also* Oliver Decl. ¶ 20; Yarshell Decl. ¶ 29. These heirs (Michael, Altara RK, and Altara NK) are Samuel's "testamentary heirs."

In March 2015, Samuel's heirs (necessary and testamentary) reached an amicable resolution to distribute his estate, which was valued at $499 million Brazilian reis (approximately $150 million USD). Under the heirs' memorandum of understanding ("MOU"), Saul was to receive (approximately) 60% of Samuel's total assets, Eva was to receive 17%, Michael was to receive 14%, and Michael's children were each to receive 4%. Reina Decl., Ex. 4 ("MOU") § 2.3. The MOU purported to "bind[] all the parties and their successors under any circumstances," "represent the full will of the parties in relation to [Samuel's] estate," and be "conditional only on judicial approval and the issue of the competent deed of distribution." *Id.* § 5.11–.13. The MOU also included a forum-selection clause. It stated that the parties "elect the

jurisdiction of the Judicial District of São Caetano do Sul, waiving any other, as privileged as it may be, to resolve any issues that may arise from" the MOU. *Id.* § 7.1.

In December 2015, before the probate court could ratify the MOU, another individual, Moacyr Agustinho Jr., came forward to claim that Samuel was his father. Reina Decl. ¶¶ 54–55; Gouvêa Decl. ¶ 16. He filed a petition to share in the distribution of Samuel's estate as a necessary heir (thus diluting the others' forced share). Gouvêa Decl. ¶ 18; Munhoz Decl. ¶ 23. To date, the probate proceeding remains pending and Moacyr's claims are unresolved.

### 3. Subsequent Proceedings

Although the parties' briefs offer little detail on the point, it appears that the relationship between Samuel's children deteriorated soon after they signed the MOU. In this litigation, Saul alleges, *inter alia*, that Michael has hidden their father's assets abroad, and distributed many of those assets to himself, his sister, and his children, perhaps explaining Michael's and Eva's willingness to assent to an MOU that allocated a far greater share of identified estate assets to Saul than that to which he would have been entitled under Brazilian law and Samuel's will.

Saul's application in this proceeding for discovery from U.S. banks derives from his claims of financial machinations and implicates several ongoing foreign proceedings. These are as follows.

#### a. Saul's accusations

The gravamen of Saul's accusations against Michael arises from the precipitous decline in Samuel's reported wealth in the years leading up to his death. In 2009, his wealth was valued at more than $2 billion Brazilian reis, but in 2014, at the time of his death, less than $500 million Brazilian reis. Reina Decl. ¶¶ 21, 38, 46. Saul here focuses on several changes in Samuel's finances.

First, Saul alleges that Michael "forged Samuel's signature" to amend Casa Bahia's articles of incorporation in 2013, and to supersede a 2009 will. *E.g.*, Saul's First Br. at 2. These steps diluted Samuel's equity; increased Michael's share; and assigned millions of shares to foreign holding companies, including the Altara movants. The 2009 will (unlike the 2013 will) had divided Samuel's estate equally among his three children. Saul has propounded two expert reports that, he contends, "confirm[] Michael forged Samuel's signature." *See id.*, Ex. 1 (report of Sebastião Cinelli); *id.*, Ex. 10 (report of Celso Del Picchia).

Second, Saul alleges that Michael and his children, and Eva, "acquired almost $500 million in real estate" in the United States between 2012 and 2015, $310 million of which was purchased between October 2014 (just before Samuel's death) and March 2015 (when the MOU was signed). Saul's First Br. at 4. This real estate, he states, "substantially exceeds the amount accounted for as part of Samuel's estate." *Id.* Saul asserts that he was "never informed" about these acquisitions. *Id.* at 16. He urges the inference that the funds used to make these purchases were Samuel's—and that the properties purchased should be considered part of Samuel's estate.

b.      *The probate, accounting, and contemplated proceedings*

The probate proceeding, the accounting proceeding, and the contemplated proceedings are properly considered together. The accounting proceeding began on May 11, 2020, pursuant to a probate court order; its purpose was to require Michael, as administrator of Samuel's estate, to provide information as to his management of the estate (and its assets) since Samuel's death. Reina Decl. ¶¶ 58–64. The probate and accounting proceedings remain pending.

Saul seeks through these proceedings to invalidate the MOU, which he claims failed to reflect the true value of his father's assets, and to establish a new division of his father's estate. He plans to pursue such relief through a petition in the probate proceeding (to oppose the MOU's

ratification), through the accounting proceeding (to prove Michael concealed foreign assets), and through an original action (to annul the MOU as the product of fraud).

The parties disagree as to whether Saul can pursue relief through these proceedings. The movants focus on Saul's several prior petitions (the most recent, in 2022) to ratify the MOU. They note that he has been permitted to withdraw at least some funds pursuant to its terms—which gave him a share far exceeding his entitlement under Samuel's will. *E.g.*, Gouvêa Decl. ¶¶ 22, 24. The movants argue that Brazil's bar on "contradictory behavior" forbids Saul from now attempting to invalidate the MOU. *E.g.*, Yarshell Decl. ¶¶ 47–48. They separately argue that the statute of limitations has run on any such claim. *E.g.*, Munhoz Decl. ¶¶ 25–32.

b.   *The criminal investigation*

The criminal investigation commenced on June 6, 2023, after a complaint filed by Saul with the 78th Police District of São Paulo (the "Criminal Authority"). Reina Decl. ¶¶ 76–78; Oliver First Decl., Ex. 2 at 77–88 (translation of complaint). Since then, the Criminal Authority has found probable cause that Michael had committed "the crime of theft by deception." Oliver First Decl. ¶¶ 39–40. The investigation remains ongoing.

c.   *The discovery proceedings*

Saul has initiated three preliminary discovery proceedings in Brazilian courts (an "*ação de produção antecipada de provas*" or "action for pretrial production of evidence"). Each was filed in April 2023. One is pending; the other two were dismissed on procedural grounds (that the requested evidence "could be obtained in the course of [a future] lawsuit"), which Saul has challenged in pending appeals. *See* Yarshell Decl. ¶¶ 54–58.

7

### 4.    The Present Petition

In this action, Saul seeks discovery from 12 U.S. financial institutions: Citibank, N.A.;

Banco Santander S.A. New York; Santander Investment Securities Inc. of New York; JPMorgan

Chase Bank, N.A.; J.P. Morgan Securities LLC; Credit Suisse (USA), Inc.; Safra National Bank

of New York; Banco Itaú S.A. New York Branch; Itaú CorpBanca; Itaú Securities; the Clearing

House Payments Company LLC; and the Federal Reserve Bank of New York.

Saul's sample subpoena demands "[a]ll Documents and Communications relating to any

payment, transaction, transfer, conveyance, wire, debit, credit, payment messages and/or

payment orders to, from, for the benefit of, on behalf of, or at the request of" Samuel, Michael,

and Eva, between January 1, 2013 to the present. Pet., Ex. 2 ("Exhibit Subpoena") at 12. It lists

"Target Entities," including the Altara and Bahia entities, and demands records of "all

transactions, withdrawals, deposits, transfers of money or any activity in a bank account

(checking, savings, and/or investment account) owned" by any such entity. *Id.* at 13.

### B.    Procedural History

On June 28, 2023, Saul filed the instant petition, Dkt. 1, along with a memorandum of

law in support, Dkt. 2 ("Pet."). On July 10, 2023, the Court granted his application. Dkt. 6.

On July 24, 2023, Michael and entities he and Eva own and control (together, "the first

movants") filed an unopposed motion to intervene, Dkt. 8, which the Court granted, Dkt. 10. On

August 2, 2023, the first movants moved to stay the subpoenas to permit them a "reasonable

opportunity to investigate [Saul's] allegations" and "seek appropriate relief." Dkt. 19. On

August 7, 2023, the Court stayed compliance with the subpoenas, and directed the first movants

and Saul to brief the merits of the subpoenas on an expedited schedule. Dkt. 27.

On August 11, 2023, entities owned and controlled by Michael's children, Raphael and Natalie (together, "the second movants"), filed a motion to quash the subpoenas. Dkt. 28. The Court, consistent with the briefing schedule set for the first movants, set an expedited schedule for the second movants' briefs on the subpoenas' merits. Dkt. 32.

Also on August 11, 2023, the first movants filed their motion to quash, Dkt. 29, and submitted a memorandum of law in support, Dkt. 30 ("First Movants' Br."). On August 15, 2023, Saul filed a memorandum of law in opposition to the first movants' motion. Dkt. 33 ("Saul's First Br."). On August 21, 2023, the second movants filed their motion to quash, Dkt. 37, and submitted a memorandum of law in support, Dkt. 38 ("Second Movants' Br."). On August 28, 2023, Saul filed a memorandum of law in opposition to the second movants' motion. Dkt. 45 ("Saul's Second Br."). On September 1, 2023, the second movants filed a reply. Dkt. 48 ("Second Movants' Reply Br.").

On October 31, 2023, the Court heard argument on both motions. Dkt. 62 ("Tr."). On November 1, 2023, Saul filed a supplemental letter addressing concerns raised by the Court in argument. Dkt. 61 ("Saul Supp. Br."). On November 2, 2023, the second movants filed a reply. Dkt. 62 ("Second Movants' Supp. Br.").

## II.    Legal Standards

Section 1782 authorizes district courts to order discovery from third parties in the United States for use in foreign proceedings. In relevant part, it provides as follows:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person . . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and

the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a). The statute thus imposes three prerequisites to the issuance of a foreign discovery order. *See, e.g.*, *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 192 (S.D.N.Y. 2006). First, the target must "reside" or be "found" in this District. Second, the evidence sought must be "for use" in a foreign proceeding. Third, the application must be made by a foreign tribunal or "any interested person."

Once those prerequisites have been satisfied, a district court has "broad discretion over the issuance of discovery orders pursuant to § 1782." *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002). In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Supreme Court set out four factors to guide district courts in exercising this discretion:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which event "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad";
>
> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court assistance";
>
> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and
>
> (4) whether the request is "unduly intrusive or burdensome."

*In re del Valle Ruiz*, 939 F.3d 520, 533–34 (2d Cir. 2019) (quoting *Intel*, 542 U.S. at 264–65). These "factors are not to be applied mechanically," and a district court "should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel ex rel. Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018). A district court's discretion should also be exercised in light of the statute's "twin aims" of "providing

efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Id.* at 244 (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)).

## III.    Discussion

Both groups of movants argue that Saul's application fails one or more of Section 1782's statutory requirements and that the Court should exercise its discretion, under *Intel*, to deny the application. The Court need not definitively resolve whether the statutory factors are met because the *Intel* factors clearly require quashing the subpoenas. But certain subpoenas are also clearly unable to—or would struggle to—satisfy a statutory factor. For completeness, the Court addresses the statutory requirements before discussing the *Intel* factors.

### A.    Statutory Requirements

Section 1782 requires an applicant to meet these requirements: (1) the entity from whom discovery is sought must reside or be found in the district in which the application was made; (2) the discovery must be "for use in a foreign proceeding before a foreign tribunal"; and (3) the applicant must be either a foreign tribunal or an "interested person." *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015) (internal quotation marks omitted). It is undisputed that Saul is an "interested person" in the relevant proceedings; the third factor is thus satisfied. *Cf. Intel*, 542 U.S. at 254 ("litigants are . . . the most common example of the 'interested person[s]' who may invoke § 1782" (alteration in original)). The first two factors, however, are disputed.

### 1.    "Resides or Is Found"

Only "[t]he district court of the district in which a person resides or is found" may require him to produce evidence for a foreign proceeding. 28 U.S.C. § 1782(a). The Second Circuit has

interpreted Section 1782's "resides or is found" requirement to extend to "the limits of personal jurisdiction consistent with due process." *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019). Thus, a person "resides or is found" in this District if he is subject to personal jurisdiction here.

Both groups of movants argue that four of the 12 subpoenaed entities are not subject to jurisdiction in this District: Itaú S.A. New York Branch ("Itaú NY"); Itaú Securities; Itaú CorpBanca; Banco Santander S.A. New York ("Santander"). First Movants' Br. at 12–13; Second Movants' Br. at 14–16. Saul disagrees. Saul's First Br. at 6.

The movants are correct. The Court considers the four entities in turn.

As to the Itaú entities, Saul acknowledges that he "misnamed" Itaú NY; as to Itaú Securities and Itaú CorpBanca, his brief proposes alternative names: respectively, "Itaú USA Securities Inc." and "Banco Itaú Chile New York Branch." Saul's First Br. at 6. These "full names" (as Saul puts it) differ markedly from those in his application. Saul nonetheless argues that the Court should treat these as the entities he *intended* to subpoena. Saul's First Br. at 6 & n.12. That bid does not save the three Itaú subpoenas at issue. Saul does not dispute that the entities he listed in his application do not exist (Itaú NY) or fall outside the Court's jurisdiction (Itaú Securities and Itaú CorpBanca). Second Movants' Br. at 15–16 & 15 n.25. Although Saul would have to address the other deficiencies identified here, he is at liberty to file a new § 1782 application addressed to new respondents; if so, those entities can appear and dispute jurisdiction over them. But Saul may not amend this application to add new parties via a brief opposing a motion to quash. *See, e.g.*, *In re SPS I Fundo de Investimento de Acoes-Investimento no Exterior*, No. 22 Misc. 118 (LAK), 2022 WL 17553067, at *4 (S.D.N.Y. Dec. 9, 2022) (granting partial motion to quash under similar circumstances: "the Court cannot have personal jurisdiction over a corporate ghost"). The Court thus quashes the three Itaú subpoenas.

As to Santander, Saul subpoenaed Banco Santander S.A., which has a branch in New York. But the entity itself is incorporated and headquartered in Spain. *See* Second Movants' Br. at 15 n.25. The Court thus lacks general jurisdiction over its activities. *See, e.g., Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). And Saul has not presented facts supporting the exercise of specific jurisdiction. *Cf., e.g., In re del Valle Ruiz*, 939 F.3d at 530 (specific jurisdiction established where "discovery material sought proximately resulted from the [subpoenaed firm's] forum contacts"). The Court thus quashes the BSNY subpoena.

The remaining eight subpoenaed entities are each incorporated in or have their principal place of business in this District. Those are: Citibank, N.A.; Santander Investment Securities Inc. of New York; JPMorgan Chase Bank, N.A.; J.P. Morgan Securities LLC; Credit Suisse (USA), Inc.; Safra National Bank of New York; the Clearing House Payments Company, LLC; and the Federal Reserve Bank of New York. It is undisputed that the Court has general jurisdiction over these entities.

### 2.      "For Use in a Proceeding in a Foreign . . . Tribunal"

The evidence sought under a Section 1782 order must be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). "[T]he requirements of § 1782 are not satisfied by the requesting party reciting some minimal relation to [the] pending foreign proceeding." *In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 706 (S.D.N.Y. 2015). Rather, evidence is only "for use" in such a proceeding if it can "be employed with some advantage or serve some use in [that] proceeding." *Mees*, 793 F.3d at 298. As such, an inquiry into "[t]he relevance of the information sought may be necessary" to the analysis, "insofar as it is difficult to conceive how information that is plainly irrelevant to the foreign proceeding could be said to be 'for use' in that proceeding." *KPMG*, 798 F.3d at 120 n.7. "Put differently, discovery is 'for

use' in a foreign proceeding if it is relevant to the subject matter of the proceeding, and the evidence would 'increase the applicant's chances of success' in the proceeding." *In re Asia Maritime Pacific Ltd.*, No. 15 Civ. 2760 (VEC), 2015 WL 5037129, at *3 (S.D.N.Y. Aug. 26, 2015) (quoting *Mees*, 793 F.3d at 291).

Whether Saul has satisfied the "for use" requirement presents difficult questions. The Court considers the issues raised by the distinct uses, in civil and criminal proceedings, to which he proposes to put the evidence he seeks.

> a.    *Civil proceedings*

Saul proposes to use the financial records he seeks to "annul" the agreed-upon distribution of Samuel's estate in civil probate proceedings, pending and contemplated. Pet. at 3; *see also id.* at 28–30. Movants argue, however, that any such effort is by now time-barred.

The parties' experts agree that Brazil's Code of Civil Procedure allows a decedent's heirs to reach an agreement dividing up the estate's assets (known as an "amicable partition") and thus foreclose future probate proceedings. Rezek Decl. ¶ 26; Munhoz Decl. ¶¶ 17–18. They agree, too, that Samuel's children did so in this case, Rezek Decl. ¶ 27; Munhoz Decl. ¶¶ 12, 21, 23, by agreeing in 2015 to an "irrevocable and irreversible" distribution of Samuel's estate, MOU § 5.11. They also agree that an heir, like Saul, who seeks to annul an amicable partition must do so within one year. Rezek Decl. ¶ 35; Munhoz Decl. ¶¶ 25, 27.

The experts disagree, however, as to when the statute of limitations begins to run. Saul's expert, José Francisco Rezek, former Justice of the Brazilian Supreme Court, argues that the limitations period commences "from the date of the final judgment" ratifying the amicable partition. Rezek Decl. ¶ 35. Because there has not been a final judgment in the probate proceedings (due to the dispute over Moacyr's paternity), Rezek argues that the limitations

14

period has yet to begin to run. *Id.* ¶ 41. In contrast, the second movants' expert, Professor

Eduardo Secchi Munhoz, argues that the limitations period commences "from the date the 2015

MOU was signed," Munhoz Decl. ¶ 27, such that Saul's window to move to annul the amicable

partition closed in 2016, *id.* ¶ 32.

Although the Court need not definitively resolve this issue given its finding that the *Intel*

factors require quashing the subpoenas, Munhoz's position is considerably more persuasive than

Rezek's. Munhoz alone translated the full relevant text at issue (Article 657 of the Code of Civil

Procedure) for this Court. Rezek quotes the introductory text of Article 657, but omits its "sole"

paragraph, which sets out the limitations period. Rezek Decl. ¶ 33. In full, Article 657 reads:

> *Art. 657.* An amicable partition by a public instrument, a term in the records of the
> probate proceeding, or a private writing approved by the judge, may be annulled
> due to fraud, coercion, essential error or the intervention of an incompetent party,
> pursuant to § 4 art. 966.
>
> *Sole paragraph.* The right to annul an amicable partition shall expire in one (1)
> year, counted from the date of the partition:
>    (i) in the case of duress, from the day of its cessation;
>    (ii) in case of error or willful misconduct, from the date of the act;
>    (iii) in the case of incapacity, from the day on which such incapacity ceases.

Munhoz Decl. ¶ 28.[4] Saul surely asserts "willful misconduct": he alleges that Michael

"deceived" him into "accepting the terms" of the MOU, having "failed to report . . . the entirety

of [Samuel's] assets," significant portions of which he had taken for himself. Pet. at 2; *see also*

*id.* at 24. Given that "the one-year statute of limitations established by law beg[ins] to run from

---

[4] Under Federal Rule of Civil Procedure 44.1, the Court may "consider any relevant material or
source . . . whether or not submitted by a party." FED. R. CIV. P. 44.1. A published translation of
Brazil's Code of Civil Procedure accords with Munhoz's translation of the relevant provision.
*See* BRAZILIAN CODE OF CIVIL PROCEDURE art. 657, sole paragraph, at p. 265 (Alexandra Barros
trans., Editora Juspodivm pub. 2017) ("The right to annul an amicable distribution expires within
one (1) year of: (i) the day on which it ceased, in the case of coercion; (ii) the day on which it
was committed, in the case of mistake or fraud; (iii) the day on which the incapacity ceased, in
the case of an incompetent party.").

the date on which [a defrauded heir] agreed to the partition proposal," Munhoz Decl. ¶ 30

(quoting Appeal No. 1,002,174, T.J.S.P. [10th Civil Law Panel], decided July 30, 2021), any

attempt by Saul to annul the MOU, signed in 2015, would be time-barred.  The cases Rezek cites

to support the contrary position either predate the relevant (2015) amendments to the Code of

Civil Procedure, or involve a judicial (*i.e.*, not an amicable) partition, to which Article 657 does

not apply.  *Compare* Rezek Decl. ¶¶ 35–36, *with* Munhoz Decl. ¶¶ 30–31.

Given the presence of a decisive alternative basis for denying Saul's application, and that

this issue implicates an unfamiliar question of foreign law, the Court declines to rule on this

ground.  *See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) (federal

court "should only consider authoritative proof" that a foreign tribunal's rules of evidence would

deem requested materials inadmissible).  *But see KPMG*, 798 F.3d at 122 n.11 (*Euromepa* should

not be applied to relieve "the burden [placed] on a § 1782 applicant to establish that [he] will

have some means of actually using the evidence [he seeks] in the foreign proceeding").  Had this

issue been dispositive, it would have presented a substantial hurdle to the application.

*b.*      *Criminal proceedings*

Saul separately proposes to use the evidence he seeks in a pending police investigation.

In June 2023, Saul filed a complaint with the 78th Police District of São Paulo (the "Criminal

Authority"), alleging Michael had forged Samuel's signature to embezzle personal and corporate

funds.  Reina Decl. ¶¶ 76–78; Oliver First Decl., Ex. 2 at 77–88 (translation of complaint).  That

same month, the Criminal Authority found probable cause that Michael had committed "the

crime of theft by deception."  Oliver First Decl. ¶¶ 39–40.  The investigation is ongoing.

The Second Circuit has defined the term "for use" in a manner casting doubt on whether Saul's intended use qualifies.[5] Its decision in *Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015) is instructive. In *KPMG*, investors in failed foreign instruments sought documents from American accounting firms relating to the instruments' default; the investors planned to use the evidence in ongoing liquidation proceedings in the Cayman Islands and Bahrain. *See id.* at 115–17. Judge Lynch, writing for a unanimous panel, held that the investors had "failed to show any way that they could put before the foreign tribunals the information they sought to discover." *Id.* at 122. The investors' sole role would be to "furnish information" to the liquidators "*in the hope* that it might be used" in their eventual report. *Id.* at 121 (emphasis in original). As Judge Lynch explained:

> That is no different from a third party providing information to a private litigant that it believes might be useful in a lawsuit, or a witness approaching a prosecutor's office claiming to have knowledge of a crime. Such information might be relevant or interesting to the recipient, but it is not "for use" in any proceeding in which the *recipient* is a party unless the recipient takes some further, independent action to introduce it.

*Id.* (emphasis in original).

On the record here, the most Saul appears able to do is to forward the evidence he obtains to the Criminal Authority, which, exercising its discretion, will decide whether to initiate a

---

[5] The Court assumes *arguendo* that the Criminal Authority's investigation is a "proceeding" before a foreign "tribunal," as Section 1782 requires. The second movants' argument to the contrary is based on case law predating the 1996 amendment to § 1782, *see* Second Movants Br. at 13–14, which clarified that "criminal investigations conducted before formal accusation" qualify as proceedings under the statute, *Intel*, 542 U.S. at 259. These precedents appear to have been overtaken by the amended statute and by *Intel* itself. *Compare, e.g., General Universal Trading Corp. v. Morgan Guaranty Tr. Co. of N.Y.*, 936 F.2d 702, 705 (2d Cir. 1991) (contrasting "adjudicative proceeding[s]," which qualify for assistance, and "law enforcement investigation[s]," which do not), *with, e.g., Intel*, 542 U.S. at 259–30 (courts may "grant assistance when proceedings are pending before investigating magistrates"), *and Optimal Inv. Servs., S.A. v. Berlamont*, 773 F.3d 456, 461–62 (2d Cir. 2014) (affirming § 1782 order for evidence for use by Swiss investigating magistrate).

formal criminal prosecution.  Dkt. 31, Ex. 1 ("Gouvêa Decl.") ¶¶ 111–13; Dkt. 50 ("Romani

Decl.") ¶¶ 20–24.  Unlike the petitioners in *In re Accent Delight International Ltd.*, 869 F.3d 121

(2d Cir. 2017), who "retain[ed] the procedural right," as civil parties to the investigation, to place

the requested documents before a foreign magistrate, *id.* at 126 n.4, 132, Saul has not pointed to

a "discernible procedural mechanism" for "injecting the evidence [he seeks] into the [relevant]

proceeding," *KPMG*, 798 F.3d at 121, 122 n.11, or a privilege under Brazilian law to do so.

Indeed, the declarations submitted here indicate that whether to consider such evidence is solely

"the prerogative of the police as the party conducting the procedure."  Romani Decl. ¶ 17.  This,

too, would present a substantial barrier to Saul's bid were it not otherwise foreclosed.[6]

### B.    *Intel*'s Discretionary Factors

Even assuming that Saul has carried his burden "to establish that [he] will have some

means of actually using the evidence [he seeks] in the foreign proceeding," *KPMG*, 798 F.3d at

124 n.11, his application would still need to satisfy the discretionary *Intel* factors.

A district court has "broad discretion over the issuance of discovery orders pursuant to

§ 1782," *In re Edelman*, 295 F.3d at 181, and "is not required to grant a § 1782(a) discovery

application simply because it has the authority to do so," *Intel*, 542 U.S. at 264; *see also In re

Grynberg*, 223 F. Supp. 3d 197, 202 (S.D.N.Y. 2017).  In *Intel*, the Supreme Court articulated

four factors to guide district courts in exercising this discretion:

> (1) whether "the person from whom discovery is sought is a participant in the
> foreign proceeding," in which event "the need for § 1782(a) aid generally is not as
> apparent as it ordinarily is when evidence is sought from a nonparticipant in the
> matter arising abroad";

---

[6] Any argument that the evidence could be "for use" in a future criminal prosecution before a
Brazilian court would be equally problematic.  As the Second Circuit has held, "discovery
material is not 'for use' in a foreign proceeding if it must first be used to persuade a third
party"—here, the Brazilian criminal authorities—"to initiate that proceeding."  *IJK Palm LLC v.
Anholt Servs. USA, Inc.*, 33 F.4th 669, 678 (2d Cir. 2022).

(2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court assistance";

(3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

(4) whether the request is "unduly intrusive or burdensome."

*In re del Valle Ruiz*, 939 F.3d at 533–34 (quoting *Intel*, 542 U.S. at 264–65). Courts exercising this discretion must consider "the twin aims of the statute, namely, providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *KPMG*, 798 F.3d at 117 (cleaned up).

For the reasons below, the Court finds that the four factors are each either neutral or weigh against Saul's application. Viewing them holistically, the application must be denied.

### 1. Factor One: Jurisdictional Reach of the Brazilian Tribunal

Under the first factor, a court is to consider whether "the person from whom discovery is sought is a participant in the foreign proceeding." *Intel*, 542 U.S. at 264. "A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce the evidence." *Id.* In contrast, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*

As the Second Circuit has explained, a district court must focus on the "real party from whom documents are sought," rather than the nominal party to whom a subpoena is addressed. *Kiobel*, 895 F.3d at 245. "[T]he relevant inquiry is whether the foreign tribunal has the ability to control the evidence sought and order production, not whether the tribunal has control over the

party targeted by the Section 1782 application." *In re Porsche Automobil Holding SE*, No. 15 Misc. 417 (LAK), 2016 WL 702327, at *7 (S.D.N.Y. Feb. 18, 2016); *see also, e.g.*, *In re Microsoft Corp.*, 428 F. Supp. 2d at 194 (framing "[t]he relevant inquiry" as "whether the evidence is available to the foreign tribunal"). If a petitioner seeks the documents of his opponent, or her privies, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Courts thus look askance at applicants who "for all intents and purposes . . . seek[] discovery from . . . their opponent in the [foreign] litigation." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004).

Here, Saul has subpoenaed only *non-parties*. However, in substance, he seeks records of the *parties*: the bank records of Michael and his adversaries in the Brazilian probate proceedings. To the extent that the recipients of Saul's subpoenas (U.S. financial institutions) prove to have responsive materials—and as reviewed below, Saul has not mustered non-speculative evidence of this—such materials by definition will be financial records of the parties to the Brazilian civil proceedings (*e.g.*, their bank statements). The respondents do not have any independent records germane to the Brazilian courts. And Saul does not dispute that, to the extent the parties have accounts at the U.S. financial institutions he has subpoenaed, they, as account holders, have access to and could access them were such materials sought of them in a Brazilian proceeding. For § 1782 purposes, Saul's subpoena is thus unlike a subpoena to a non-party percipient witness, *see, e.g.*, *Optimal Inv. Servs., S.A. v. Berlamont*, 773 F.3d 456, 461–62 (2d Cir. 2014), or even a subpoena to a U.S.-based employee of a foreign party, *In re 000 Promneftstroy*, 134 F. Supp. 3d 789, 792 (S.D.N.Y. 2015). In substance, "the real party from whom documents are sought" are Saul's opponents (the heirs), all of whom are "involved in [the] foreign

proceedings." *Kiobel*, 895 F.3d at 245; *see also, e.g.*, *In re Elvis Presley Enters. LLC*, No. 15 Misc. 386 (DLC), 2016 WL 843380, at *3 (S.D.N.Y. Mar. 1, 2016) (first *Intel* factor weighed against § 1782 application when documents were sought from foreign opponent's "wholly-owned subsidiary"). "The first *Intel* factor [thus] counsels against granting" Saul's petition. *Kiobel*, 895 F.3d at 245.

To be sure, the Second Circuit's leading cases on this factor arose in the context of subpoenas to a party's *legal* counsel. *See Schmitz*, 376 F.3d at 85; *Kiobel*, 895 F.3d at 241. Such subpoenas implicate unique concerns about lawyer-client relations (and the need for candor and confidentiality) not presented by subpoenas to U.S. financial institutions. But similar logic applies. A ruling otherwise would undermine the first *Intel* factor. It would invite foreign parties to end-run directly seeking discovery from their adversaries in the foreign proceeding by serving § 1782 subpoenas on the adversaries' U.S.-based agents or archivists. Absent some justification for this expedient, the first *Intel* factor weighs against his application. The purpose of the first factor, after all, is to show appropriate deference to the foreign tribunal, which "can itself order [the parties] to produce evidence." *Intel*, 542 U.S. at 264.

On the record at hand, the first factor weighs against Saul's application.

### 2.     Factor Two: Nature and Receptivity of the Brazilian Tribunal

The second factor examines "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Id.* at 264. The Second Circuit instructs that district courts "should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," including, for example, "a forum country's

judicial, executive, or legislative declarations that specifically address the use of evidence gathered under foreign procedures." *Euromepa S.A.*, 51 F.3d at 1099–100.

The Court finds this factor neutral. As the second movants note, the one outstanding issue before the Brazilian probate court concerns Moacyr's claim of Samuel's paternity. The requested discovery will be at best peripheral, and at worst irrelevant, to such proceedings. *Cf., e.g., In re King.com Ltd.*, No. 16 Misc. 80070 (JCS), 2016 WL 4364286, at *8 (N.D. Cal. Aug. 16, 2016) (second factor weighed against discovery where foreign tribunal had "suspended the submission of evidence" as to all issues). That said, as Saul argues, he also contemplates a proceeding to invalidate the MOU. In such a proceeding, evidence of his siblings' financial dealings, including to camouflage assets that should have been treated as belonging to the estate, may well be germane. Although Saul's argument is weakened by the fact that no such proceeding is underway, there is no indication that, were it to be initiated, a Brazilian court would categorically reject such evidence. Saul First Br. at 32–33; Dkt. 5 ("Oliver Decl.") ¶¶ 50-53; *see also In re Degens*, No. 20 Misc. 237 (JGK) (RWL), 2020 WL 4252725, at *4 (S.D.N.Y. July 24, 2020) ("no Brazilian rule, policy, or law prohibits or discourages" Brazilian courts from considering evidence acquired under Section 1782). The Court thus finds this factor neutral.

### 3. Factor Three: Attempt to Circumvent U.S. and Brazilian Laws or Policies

Under the third *Intel* factor, the Court may consider Saul's efforts in the Brazilian courts to procure the information he seeks here. Courts are loath to condone "blatant end-run[s] around 'foreign proof-gathering restrictions or other policies of a foreign country'" and have refused to grant § 1782 applications that would "preempt or contradict" decisions by foreign tribunals. *Microsoft Corp.*, 428 F. Supp. 2d at 195 (citing *Intel*, 542 U.S. at 264)). Of course, "§ 1782 contains no foreign-discoverability requirement." *Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir.

2015). And "'proof-gathering restrictions' are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Id.* at 303 n.20 (emphasis in original).

The third factor weighs against Saul's application, but only slightly. As the second movants note, the MOU contains an exclusive jurisdiction clause. Second Movants Br. at 22. Under it, Saul "elect[ed] the jurisdiction of the Judicial District of São Caetano do Sul, waiving any other, as privileged as it may be, to resolve any issues that may arise from" the MOU. MOU ¶ 7.1. "Courts in this District have determined that the petitioner's decision to enter into a forum-selection clause is a factor that can weigh against the granting of an application brought under section 1782." *In re Alghanim*, No. 21 Misc. 167, 2022 WL 1423088, at *4 (S.D.N.Y. May 5, 2022) (collecting cases); *see also Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 595 (7th Cir. 2011) ("a forum-selection clause in a contract" counsels against § 1782 discovery where the parties did not "contemplate the level of compulsory process available in America"). To allow Saul to pursue discovery in the United States would arguably allow him to sidestep the exclusive forum that he agreed would arbitrate disputes among him and his siblings. That said, the forum selection clause does not textually preclude use of vehicles like § 1782 to procure discovery abroad. And the case law does not categorically hold such clauses to foreclose all foreign discovery. *See generally* LUCAS V.M. BENTO, THE GLOBALIZATION OF DISCOVERY § 9.12, at 198–99 (2020). The MOU's exclusive-jurisdiction clause, though not preclusive, thus weighs against Saul's application.[7]

---

[7] The Court rejects the second movants' separate argument that the Brazilian courts are "hostile" to Saul, "having dismissed his preliminary discovery proceedings and rejected his efforts to remove Michael as the administrator of Samuel's estate." Second Movants' Br. at 20–22. As

### 4.   Factor Four: Undue Intrusion or Burden

To "assess whether the discovery sought is overbroad or unduly burdensome," a court

must "apply[] the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*,

793 F.3d at 302. "[W]hether a request is intrusive or burdensome should not be assessed based

on the 'discovery scope' available in the foreign proceeding." *Id.*  Rule 26(b)(1) provides that

the scope of discovery is limited to "relevant" material that is "proportional to the needs of the

case . . . and whether the burden or expense of the proposed discovery outweighs its likely

benefit," among other factors. *Elvis Presley Enters.*, 2016 WL 843380, at \*5. "Proportionality

and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the

less likely its discovery will be found to be disproportionate." *Vaigasi v. Solow Mgmt. Corp.*,

No. 11 Civ. 5088 (RMB) (HBP), 2016 WL 616386, at \*14 (S.D.N.Y. Feb. 16, 2016).

This factor weighs heavily against Saul's application.  Saul's subpoenas—seeking "[a]ll

documents and communications" from 12 financial institutions[8] relating to 26 entities[9] covering

---

Saul has shown and as is undisputed, two of the three preliminary discovery proceedings "were
rejected by a first level court without a decision on the merits," and are pending on appeal; the
third remains pending.  Rezek Decl. ¶ 21.  And the second movants' expert admits that these
proceedings failed because the evidence sought "could be obtained in the course of [a future]
lawsuit" in Brazil.  Yarshell Decl. ¶ 13.

[8] The financial institutions are: "Citibank, N.A.; Banco Santander S.A. New York; Santander
Investment Securities Inc. of New York; JPMorgan Chase Bank, N.A.; J.P. Morgan Securities
LLC; Credit Suisse (USA), Inc.; Safra National Bank of New York; Banco Itaú S.A. New York
Branch; Itau CorpBanca; Itaú Securities; the Clearing House Payments Company LLC; and the
Federal Reserve Bank of New York." Pet. at 6.

[9] As listed in Saul's exhibit subpoena, the entities are: "Altara RK Investments Limited; TWINS-
CB Limited; EK-VV Limited; Bahia VV RK Limited; Bahia VV NK Limited; Altara NK
Investments Limited; Haifa International Corporation; Kireland 83rd Street Chicago LLC;
Kireland Belvidere Street Waukegan LLC; Kireland Commercial Ave Chicago LLC; Kireland
Genesis Drive North Aurora, LLC; Kireland Kirby Plaza Houston LLC; Kireland LLC; Kireland
Mainstreet Fairfax LLC; Kireland North Dearborn Street Chicago LLC; Kireland Peach Tree
Road Atlanta LLC; Kireland South Elgin Illinois LLC; Kireland West Heimer Road Houston

an almost 11-year period—are extremely broad. *Optionality Consulting Pte. Ltd v. Edge Tech. Grp. LLC*, 18 Civ. 5393 (ALC) (KHP), 2022 WL 1977746, at *4 (S.D.N.Y. Jun. 3, 2022) (describing subpoena for "all documents and communications" over extended period as "wildly overbroad" and "presumptively improper").

Counsel's papers in support of the § 1782 application had been notably silent on Saul's basis for subpoenaing these 12 banks. At argument, when the Court probed Saul's counsel as to the basis for pursuing subpoenas against the 12 financial institutions, counsel—startlingly—was unable to identify a factual basis for seeking records from *any* of these entities. Counsel ultimately could offer only that Saul "had [a] recollection [that] some of the institutions" were ones "his father usually used to hold accounts with." Tr. 38. That statement would not support the bulk of the § 1782 subpoenas, which seek records of accounts of others (*e.g.*, Michael, Eva, and the Altara and Bahia entities). In all events, the Court invited counsel to fortify the representation that Samuel had done business with some of the institutions, but counsel's post-argument letter failed entirety to do so. Its sole relevant exhibit, Samuel's 2014 tax return, lists transactions made through "Safra JS Adm. de Recursos S/A," "Banco Safra" and "Citibank Fundos de Investimentos"—all of which appear to be *Brazilian* entities, and none of which are subpoenaed here. Saul Supp. Br., Ex. 1 at 2–27. Indeed, as the second movants note, all of the transactions reflected therein appear to have occurred within Brazil; there is no indication whatsoever that U.S. financial institutions were even involved. Second Movants' Supp. Br. at 1. In sum, to an exceptional degree, in the Court's experience, Saul's application presents as "an archetypal fishing expedition." *In re MT Baltic Soul Produktentankschiff-Ahrtsgesellschaft mgH*

---

LLC; Kireland-B, LLC; Mikeone EK 801 West LLC; Mikeone EK 809 West LLC; Mikeone Ek ATL Ops Center LLC; Mikeone EK Columbia SC LLC; Mikeone EK Linden LLC; Mikeone EK Roanoke LLC; Mikeone M Street Holdings LLC." Exhibit Subpoena at 6.

*& Co. KG*, No. 15 Misc. 319 (LTS), 2015 WL 5824505, at *3 (S.D.N.Y. Oct. 6, 2015); *see also Jiangsu S.S. Co. v. Success Superior Ltd.*, No. 14 Civ. 9997 (CM), 2015 WL 3439220, at *1, *5 (S.D.N.Y. Feb. 5, 2015). It could have been made to 12 randomly selected banks in this District and would have had no less a factual foundation.

The wholly conjectural basis for Saul's § 1782 subpoenas is dispositive as to this factor. Had Saul come forward with a concrete basis for the assumption that these 12 banks held pertinent transaction records of Samuel, Michael, Eva, or associated persons—as opposed to guessing that these 12 might—the subpoenas, at least in part, might have cleared the undue-burden bar. The banks have not claimed a production burden. And the records sought are likely not onerous to unearth: given the nature of such electronically stored materials, banks "should be able to search for and produce the records of wire transfers without significant burden." *In re Rodriguez Guillen*, 20 Misc. 102 (ALC), 2020 WL 3497002, at *3 (S.D.N.Y. June 29, 2020). But, where "a subpoena sweepingly pursues material with little apparent or likely relevance to the subject matter it runs the greater risk of being found overbroad and unreasonable," *United States v. Int'l Bus. Machs. Corp.*, 83 F.R.D. 97, 106–07 (S.D.N.Y. 1979), even where, as here, complying with the request has not been shown to be onerous, *see, e.g.*, *Kirschner v. Klemons*, No. 99 Civ. 4828 (RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005).

Were a broad-ranging subpoena propounded to a bank in ordinary domestic civil litigation with the proponent unable to articulate a non-speculative basis to believe that an entity relevant to the litigation had done business with the bank, the Court would be obliged to quash it, under Federal Rule of Civil Procedure 26. *Cf., e.g.*, *In re Glitnir banki hf.*, No. 08 Bk. 14757 (SMB), 2011 WL 3652764, at *5 (Bankr. S.D.N.Y. Aug. 19, 2011) (quashing subpoenas issued to financial institutions on the grounds of relevance and undue burden); *Tattersalls Ltd. v.*

*Wiener*, No. 17 Civ. 1125 (BTM) (KSC), 2019 WL 13204024, at \*2 (S.D. Cal. Nov. 19, 2019)

(same); *Ramirez v. World Mission Soc'y*, No. 14 Civ 1708 (JMV), 2019 WL 13397448, at \*3

(D.N.J. May 14, 2019) (same).  And Section 1782's burden factor is intended to correspond to

the standards of U.S. civil litigation.  *See Mees*, 793 F.3d at 302.  Under these circumstances, the

Court finds the fourth *Intel* factor weighs heavily against Saul's application.

### 5.   Weighing the Factors

The *Intel* "factors are not to be applied mechanically," and a court "should also take into

account any other pertinent issues arising from the facts of the particular dispute."  *Kiobel*, 895

F.3d at 245.

Here, the balance of the factors yields a clear outcome.  The *Intel* factors are either

neutral (the second factor) or weigh against the application (the first, third, and fourth factors).

And the fourth factor weighs particularly heavily.  The Court's determination that there is no

non-speculative basis for the subpoenas—that Saul proposes to issue these in grapeshot fashion

in the hope to discover accounts of his Brazilian adversaries—suggest that this application is "a

'fishing expedition'" with the potential to be "a vehicle for harassment" of Saul's siblings.  *In re*

*Request for Assistance from Ministry of Legal Affs. of Trinidad & Tobago*, 848 F.2d 1151, 1156

(11th Cir. 1988).  That consideration reinforces the Court's discretionary decision here to deny

the application.

As Judge Caproni explained in an analogous case:

> Far from being an efficient means of assistance to participants in international
> litigation, the subpoenas would direct sixteen large banks to conduct broad searches
> for information when the [petitioner] has provided *no* basis to believe that [the
> opposing parties in the foreign litigation] ever transacted business through any
> particular bank.  That is too great a burden to impose on non-parties, particularly
> on an *ex parte* basis.  The Court seriously doubts that this is the example Congress
> intended to set by authorizing discovery pursuant to § 1782.

*In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 705 (S.D.N.Y. 2015).

Had there been a basis to pare the subpoenas down to focus them on record requests that were appropriate, the Court would have considered doing so, rather than deny relief outright. But the record here does not permit the subpoenas to be thus reformed, as Saul has not articulated a non-speculative factual basis to issue any of the subpoenas, even in narrowed form. The Court thus "is free to deny the application *in toto*." *Euromepa*, 51 F.3d at 1101. Approving the subpoenas on the present record would open up another front in the ongoing war within the unhappy Klein family, for no legally supportable reason. The Court declines to do so.

## CONCLUSION

For the foregoing reasons, the Court grants the movants' motions to quash the subpoenas. The Clerk of Court is respectfully directed to terminate all pending motions and to close this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: December 21, 2023
      New York, New York